865 So.2d 227 (2004)
STATE of Louisiana, Appellee,
v.
Solomon MOORE, Appellant.
No. 37,935-KA.
Court of Appeal of Louisiana, Second Circuit.
January 28, 2004.
*229 Louisiana Appellate Project, by Kenota P. Johnson, Counsel for Appellant.
Jerry L. Jones, District Attorney, Geary S. Aycock, Assistant District Attorney, Counsel for Appellee.
Before WILLIAMS, STEWART and MOORE, JJ.
STEWART, J.
The defendant, Solomon Moore ("Moore"), was convicted by a jury of attempted second degree murder, second degree kidnaping and armed robbery and sentenced to serve 40 years, 65 years and 40 years respectively for each conviction. These sentences were ordered to be served consecutive to each other and to run consecutive to any other terms Moore was sentenced to serve. The defendant now appeals. We affirm each of the defendant's convictions. However, we amend the sentences for attempted second degree murder and armed robbery, and remand the sentence for second degree kidnaping for hearings consistent with this opinion.

FACTS
At about 11:00 p.m. on January 17, 2002, law enforcement officials were summoned *230 to North Monroe Hospital in Monroe to investigate what was reported as an abduction, robbery and shooting. When the first patrolman arrived, he found a young woman named Misty Barlow ("Barlow") with injuries to her back right shoulder, chest and thumb.
Barlow related to officials that earlier in the evening around 10:00 p.m., she was making deliveries in connection with her job at Johnny's Pizza. On her last delivery she turned onto Peach Street in Monroe where she noticed four black males standing outside a pool hall on the corner of Montgomery and Peach Streets. She then realized that she had turned the wrong way on Peach Street, and she turned around in a driveway. When she came back through the intersection in front of the pool hall, the four men spread out across the road, and she passed through them with two on each side of her vehicle.
She continued down Peach Street, found the correct address, and got out of her car to make the delivery. As she returned to her vehicle, she saw a black male standing by her car. He asked her who had answered the door during the delivery. She replied that she did not know. After Barlow got into her gray, four door, Mazda Protege, she heard a tap on the window and noticed that the driver-side door was being opened. The man put a pistol to her head and told her to get into the backseat.
Barlow had trouble getting into the backseat because she wore a prosthesis on her amputated left leg. The assailant pushed her and told her to hurry or he would shoot her right there. At this point she noticed that a man was standing behind a tree and two other people in front of the pool hall. She realized they were the four men she had passed in the street earlier.
She begged the assailant, later identified as Lee Roy "Luther" Warren ("Warren"), to let her go and offered him the Johnny's Pizza billfold that contained over $100.00 in exchange for her freedom. He apparently took the money, but instead of releasing her, Warren backed out of the driveway, went back down the street and pulled into another driveway of what appeared to be a vacant house. The other three men ran up to the vehicle.
Warren made her assist him in getting her child's car seat unbuckled, and it was thrown out. He then got into the backseat and sat next to Barlow. Another man later identified as Willie Ethridge ("Ethridge") also got in the backseat. The defendant got in the front passenger seat and taking the driver's seat was a man later identified as Danny Hargrove ("Hargrove").
Barlow recognized that they were taking her on the interstate and over to Monroe. The men discussed what they were going to do with her, and they agreed that they would kill her since she had heard one of their names. They drove to an area that she was unfamiliar with and stopped. When they opened her car door, she stepped out and began running. She was shot in the back in the upper right shoulder area. She fell in a ditch and was able to get back up. She heard two more gunshots, and she felt hits on her thumb and chest. She then heard three or four clicks of the empty gun. Warren yelled that she was dead. She heard the men talking in the car and one said that they had to make sure she was dead, so she laid still and closed her eyes. One of the men ran over to her, rolled her over and lifted her up by her shirt. He ran back toward the car and hollered that she was dead. After she heard the car drive away, Barlow got up and ran in hope of finding help. She tried to flag down cars that passed by *231 until one driver, Jeremy Michot, stopped to help. He drove her to North Monroe Hospital.
Barlow was able to give authorities her license plate number and information describing the abductors as four black males. She also described the outfit of one of the assailants as a blue jean jacket with matching jeans. Radio dispatchers put out a "be on the look out" (BOLO) message to area law officers.
At around midnight a state trooper was about a mile and a half from the pool hall area when he discovered an SUV parked in an odd way. He ran the plates and discovered it was registered to someone who lived in Monroe and thought it was an unusual place for it to be abandoned. He cruised the area and saw five black men on foot nearby. He noticed that one of the men matched the description in the BOLO and observed them. They went to a nearby Chevron station. When they came out of the store, they split up. He followed two of them. He stopped and asked them what they were doing and videotaped the investigation on his cruiser's built-in video camera. The man in the blue jean jacket identified himself as Lee Roy Warren, and the defendant identified himself with his real name, Solomon Moore. After questioning the men, he released them and they turned to walk through a field.
The trooper drove to where the trail in the field ended and observed all five men coming out of the area. He told Warren and Moore they could continue on since he had already spoken to them. He interviewed the other three, again taping the encounter. The three identified themselves as Mashaylin Green ("Green"), Kenneth Shaw ("Shaw") and Sam Farmer ("Farmer"). It was later determined that Shaw and Farmer had given false names and were actually Danny Hargrove ("Hargrove") and Willie Ethridge ("Ethridge"). They told him the vehicle had run out of gas and they had walked to the store to purchase gas. They indicated the vehicle, an SUV, was parked where he had seen the abandoned vehicle. The trooper also released these men.
The trooper learned that Barlow's vehicle had been found burned in West Monroe and he went to that crime scene. Since the residence of the registered owner of the SUV was in close proximity to the location of Barlow's burned vehicle, the search turned toward finding the SUV and its occupants for further questioning.
The police found the vehicle later with only Green in it. He told them that a little after 11:00 p.m. he was at Winnsboro Gas and Grocery in Monroe when a friend of his, Danny Hargrove, asked if Green could take Hargrove and three of his friends to West Monroe. He said he gave them a ride, but ran out of gas. He said after they had been stopped by the trooper, he dropped off one of the guys, whom he could not identify, in West Monroe. Hargrove rode back to Monroe with Green. He dropped Hargrove off and went to another gas station. He was stopped on his way home.
All four men were picked up and arrested within days of the crime. The other three men gave statements implicating themselves and the defendant with the crime.
Keydra Lacy, an employee of the pool hall, testified that she had seen both a woman fitting the description of Barlow and the defendant in a small car outside the pool hall at the same time of the abduction that night.
The defendant was indicted on February 25, 2002, of attempted second degree murder, armed robbery and aggravated kidnaping. The three other co-defendants entered *232 guilty pleas prior to the defendant's trial.
On December 7, 2002, the defendant was found guilty of attempted second degree murder, second degree kidnaping and armed robbery in an 11-1 jury verdict. On April 11, 2003, he was sentenced to serve 40 years on the attempted murder charge, 65 for the armed robbery, and 40 on the kidnaping conviction. An oral motion for reconsideration of sentence was made and denied. This appeal ensued.

DISCUSSION

Sufficiency of Evidence
Under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the proper standard of appellate review for insufficiency of evidence is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could reasonably conclude that all of the elements of the offense have been proven beyond a reasonable doubt. State v. Bosley, 29,253 (La. App.2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La.App.2d Cir.9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/5/99), 737 So.2d 747.
This court's authority to review questions of fact in a criminal case does not extend to credibility determinations made by the trier of fact. La. Const. art. 5, § 10(B); State v. Williams, 448 So.2d 753 (La.App. 2d Cir.1984). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Bosley, supra.
The defendant concedes that the crimes were committed. In brief he argues that the witness who testified she saw him in the car with Barlow should not be believed and that the testimony of Barlow's identification of him is unclear.
Keydra Lacy testified on direct examination that she knew the defendant and the other three men involved in the crimes well. She was the niece of the pool hall owner and worked there. She had also resided in the rear of the pool hall for several years. She stated that the defendant had been a regular patron of the pool hall. She testified that the four men had come into the pool hall on the evening of the incident. Later while she was outside taking a break, she saw Danny Hargrove drive by in a small grey vehicle with the appellant in the front passenger seat. She saw a white female in the seat behind the driver and two other passengers whose faces she could not see in the rear.
On cross examination Lacy further described the white female as having curly blond hair. Barlow testified that her hair was blond and curly on the night she was shot. Although the defense tried to discredit her testimony since she did not report seeing the men and the woman when she was originally questioned by police, she explained that at the initial questioning she was only asked whether or not she had heard any screams or knew anything about a kidnaping. It was not until the police returned days later and asked her if she had seen four men and a woman that *233 evening that she gave them the information.
Barlow identified the defendant as one of the men who kidnaped her both by out-of-court and in-court identifications. She viewed the videotape made by the state trooper and picked out the defendant as one of the men involved. She also told authorities that he had sat in the front seat of her car.
The defendant tried to discredit Barlow's testimony about the out-of-court identification on two grounds. On cross examination the defense tried to show that Barlow originally stated at the hospital that she could only identify one of the abductors. She was able to explain that when first questioned she gave details about the man who abducted her at gunpoint with specificity because she had gotten a really good look at him and could remember his outfit. She indicated that she was in a lot of pain and that she could not recall exactly what she did or did not tell the numerous officers who questioned her that night.
However, she also testified that she had told the investigators that one of the men was lighter complected and wore a light blue jacket before she ever viewed the videotape of the men. Her testimony, which was corroborated by the police officer, was that she gave her statement before viewing the tape. She admitted that the officers had given her the impression that the men in the video were suspects but that she recognized them "as soon as they started playing the tape." On cross she stated that she recognized the defendant and said "I remember that man sitting in that seat and turning around and talking with the other guys."
In addition to these two witnesses, the state produced the girlfriend of the defendant who testified that she dropped the four men off at the pool hall shortly before the time of the crime. The testimony of Mashaylin Green placed the defendant with the three other men near Barlow's burned-out car and the abduction site. The state trooper had seen him with the other three men in West Monroe near the abduction site also. There is nothing in the record to show that the witnesses contradict one another. La. R.S. 14:24 states:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
We find that the evidence, viewed in the light most favorable to the prosecution, proves beyond a reasonable doubt that the defendant was part of the group of men who kidnaped their victim at gunpoint, robbed her of her money, and shot her thinking they had left her dead so she could not identify them. Thus, this court is bound to uphold the findings of the trier of fact since the record more than amply supports the jury's finding. This assignment lacks merit.
The appellant argues that the court did not comply with La.C.Cr.P. art. 894.1 and therefore the record is inadequate for this court to review. He further urges that the sentences which arise from a single course of action are excessive since they are the maximum or near maximum allowed. He also argues that the trial court should have ordered that the sentences be served concurrently, again because all three convictions arise from a single course of action.
The defendant's oral motion to reconsider sentence simply states that the sentence is excessive and requests that the court reduce the sentence. Therefore, the *234 defendant has only preserved a review of his sentence for constitutional excessiveness.
The definition of criminal conduct and the provisions of penalties for such conduct is a purely legislative function. State v. Carlos Johnson, 31,448 (La. App.2d Cir.03/31/99), 747 So.2d 61, writ denied, 99-1689 (La.11/12/99), 749 So.2d 653. When a defendant's motion for reconsideration urges merely that the sentence is excessive, he is relegated only to a claim of constitutional excessiveness. State v. Mims, 619 So.2d 1059 (La.1993). This bare claim preserves only a claim of constitutional excessiveness. State v. Mims, supra; State v. McEachern, 624 So.2d 43 (La.App. 2d Cir.1993).
La.C.Cr.P. art. 881.1 applies to defendant's sentence. This article precludes the defendant from presenting arguments to the court of appeal which were not presented to the trial court. In such a circumstance, the defendant is simply relegated to having the appellate court consider the bare claim of constitutional excessiveness. Mims, supra; State v. Duncan, 30,453 (La.App.2d Cir.2/25/98), 707 So.2d 164.
The test imposed by the reviewing court in determining the excessiveness of a sentence is two-pronged. The record must show that the trial court took cognizance of the criteria set forth in La.C.Cr.P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La.1983); State v. Dunn, 30,767 (La.App.2d Cir.6/24/98), 715 So.2d 641. The articulation of the factual basis for a sentence is the goal of La.C.Cr.P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La.C.Cr.P. art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982).
Whether the sentence imposed is too severe depends on the circumstances of the case and the background of the defendant. A sentence violates La. Const. art. 1, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Hogan, 480 So.2d 288 (La.1985); State v. Bradford, 29,519 (La.App.2d Cir.4/2/97), 691 So.2d 864. In selecting a proper sentence, a trial judge is not limited to considering only a defendant's prior convictions but may properly review all prior criminal activity. State v. Jackson, 612 So.2d 993 (La.App. 2d Cir.1993).
The following statutes apply to the defendant's sentences:
La. R.S. 14:30.1Second Degree Murder
B. Whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.
La. R.S. 14:27Attempt
D. (1)(a) If the offense so attempted is punishable by death or life imprisonment, he shall be imprisoned at hard labor for not less than ten nor more than fifty years without benefit of parole, probation, or suspension of sentence;
La. R.S. 14:64Armed Robbery

*235 B. Whoever commits the crime of armed robbery shall be imprisoned at hard labor for not less than ten years and for not more than ninety-nine years, without benefit of parole, probation, or suspension of sentence.
La R.S. 14:44.1Second Degree Kidnaping
C. Whoever commits the crime of second degree kidnaping shall be imprisoned at hard labor for not less than five nor more than forty years. At least two years of the sentence imposed shall be without benefit of parole, probation, or suspension of sentence.
The sentencing range for the attempted second degree murder was 10-50 years. The trial court meted a 40-year sentence. This could be classified as a near maximum sentence.
The trial court ordered a 65-year term for the armed robbery. The statutory range is 10-99 years; thus, this is not a maximum or near maximum sentence. The maximum sentence of 40 years was given in the second degree kidnaping conviction.
The defendant's brief is inaccurate when it states that the trial court failed to follow the mandates of La.C.Cr.P. art. 894.1. The trial court specifically refers to its review of the article and expresses which portions are applicable. Further, prior to imposing sentence, the trial court reviewed a PSI report and considered the facts of the case. The court noted that defendant had an extensive adult criminal record and that four of his prior felony convictions involved crimes against persons.
Further, the judge specifically stated that he found no mitigating factors and felt that long-term incarceration was the only solution to keeping this dangerous man from committing another crime of violence.
In deciding to have the sentences run consecutive to each other, the judge referenced La.C.Cr.P. art. 883 and followed its mandates by articulating his reasons. He found that this crime was cruel and vicious and that the appellant had shown no remorse during the course of the trial and sentencing.
While the aggregate of this sentence will have the likely effect of keeping the defendant incarcerated for life, it does not shock one's sense of justice. Barlow was shot and left for dead. The intent of the group of men who shot her and left her abandoned on the side of the road was to take her life. The testimony was clear that none of the men disagreed with the decision to kill her or tried to stop the action. These assignments have no merit.

Error Patent
An error patent review yields illegal sentence issues that the state has not raised on appeal. At the time of sentencing the trial judge failed to order that the sentences be served without benefit of parole, probation or suspension of sentence. The written sentencing judgment tracks the transcript and omits the benefits reservations also. However, the judgment of conviction and sentence includes the reservation of no benefits as to all three sentences.
Our court has previously held that the controlling voice of the trial court is the transcript. The court states in State v. Sebastien, 31,750 (La.App.2d Cir.3/31/99), 730 So.2d 1040:
The district court is required to pronounce sentence, but a written judgment is not required. La.C.Cr.P. art. 871; State v. Boyte, 571 So.2d 722 (La.App. 2nd Cir.1990). Discrepancies between a written judgment and the sentencing transcript should be resolved in favor of the oral sentence reflected in the sentencing transcript. State v. Boyte, supra.

*236 When a district court fails to order service of sentence without benefits in a case in which a determinate time period to be so served is mandated by the statute of conviction, the sentence automatically will be served without benefits for the required time period. La. R.S. 15:301.1(A); State v. Williams, 00-1725 (La.11/28/01), 800 So.2d 790, 799.
For many years, this court has followed rulings of the Supreme Court of Louisiana which held that when a defendant alone has appealed and the record contained an error patent favorable to him, an appellate court should ignore the error unless the prosecution, having properly raised the issue in the trial court, has also sought appellate review. State v. Fraser, 484 So.2d 122 (La.1986); State v. Jackson, 452 So.2d 682 (La.1984).
The supreme court modified that jurisprudence in State v. Williams, supra. In Williams, a case of DWI-third offense, the trial court imposed an illegally lenient sentence. The defendant, alone, appealed. The appellate court, noting error patent, vacated the sentence and remanded for resentencing. The supreme court affirmed.
The court noted that, in Section 2 of 1999 La. Acts 94, effective August 15, 1999, the legislature stated its intent to "overrule" the Jackson-Fraser line of cases. That intent, the court held, is in accord with the recognized rule that a defendant does not have a constitutional right to an illegally lenient sentence. Fraser, supra at 124.
Acts 94 enacted La. R.S. 15:301.1, paragraph (A) of which provides: When a criminal statute requires that all or a portion of a sentence imposed for a violation of that statute be served without benefit of probation, parole or suspension of sentence, each sentence imposed under that statute shall be deemed to contain the provisions relating to the service of that sentence. The failure of a sentencing court to specifically state that all or a portion of the sentence is to be served without benefits shall not affect the statutory requirement that all or a portion of the sentence be served without benefits.
Thus, when a district court fails to order service of sentence without benefits where the portion to be so served is mandated, and the state has failed to appeal, this court need not state that it cannot modify the sentence or remand due to the state's failure to appeal, because the sentence automatically will be served without benefits for the required time period. This result occurs because paragraph A of La. R.S. 15:301.1 is self-activating.
However, when the statute of conviction provides that "at least" some portion of the sentence is to be served without benefits, as in the case of a conviction for second degree kidnaping, sentencing discretion is still involved. In such a case, "it was necessary for the appellate court to remand the matter to the trial court for re-sentencing." Williams, supra. Thus, in cases involving "at least" language, remand should be required.
While the "without benefits" omission can be corrected by this court in the attempted second degree murder and armed robbery sentences, the second degree kidnaping statute has a discretionary portion of the benefit suppression. Specifically, the pertinent part of La. R.S. 14:44.1 states, "At least two years of the sentence imposed shall be without benefit of parole, probation, or suspension of sentence." Therefore, we remand this matter to the trial court for correction of the sentence on second degree kidnaping.

CONCLUSION
All three convictions are affirmed. We amend both the attempted second degree *237 murder and armed robbery sentences to include that they are to be served without benefit of parole, probation or suspension of sentence. This matter is remanded to the trial court for resentencing on the second degree kidnaping conviction for it to set the length of the portion of the sentence which is to be served without benefit of parole, probation or suspension of sentence.
AFFIRMED IN PART. AMENDED IN PART. REMANDED IN PART.