965 So.2d 427 (2007)
STATE of Louisiana
v.
Tony Joseph TABOR.
No. 2007 KA 0058.
Court of Appeal of Louisiana, First Circuit.
June 8, 2007.
*428 Ellen Daigle Doskey, Jay Luke, Assistant District Attorney, Counsel for Appellee State of Louisiana Houma, LA.
Bertha M. Hillman, Louisiana Appellate Project, Thibodaux, Counsel for Defendant/Appellant Tony Joseph Tabor.
Before: PARRO, GUIDRY, and McCLENDON, JJ.
McCLENDON, J.
The defendant, Tony Joseph Tabor, was charged by amended bill of information with one count of second degree kidnapping, a violation of LSA-R.S. 14:44.1, and pled not guilty. Following a jury trial, he was found guilty as charged by unanimous verdict. He moved for a new trial and a post-verdict judgment of acquittal, but the motions were denied. He was initially sentenced to five years at hard labor, suspended upon serving two years without benefit of parole, probation, or suspension of sentence and a $1,000 fine. Thereafter, the state filed a habitual-offender bill of information against the defendant, alleging he was a second-felony habitual offender. Following a hearing, the defendant was adjudged a second-felony habitual-offender, the sentence initially imposed was vacated, and he was sentenced to twenty years at hard labor without benefit of probation or suspension of sentence and a $1,000 fine. He moved for reconsideration of sentence, but the motion was denied. He now appeals, designating two assignments of error. We affirm the *429 conviction, affirm the habitual-offender adjudication, vacate the sentence, and remand for resentencing in accordance with this decision.

ASSIGNMENTS OF ERROR
1. There was insufficient evidence to support the conviction.
2. The trial court erred in imposing a constitutionally excessive sentence.

FACTS
The victim, Brandi Lynn Beyer Van Norman, testified at trial. Approximately three weeks before the incident, she met the defendant while she was making a pizza delivery to a bar. Thereafter, the victim and her three children began visiting the defendant at his grandmother's house, where he also lived. The victim and her children stayed overnight at the defendant's grandmother's house "a couple of times" during the three-week period.
Specifically, on Friday, May 21, 2004, the victim and her children spent the night with the defendant. The next day, the defendant, the victim, her children, and the defendant's friend, Danny Robichaux, drove to the beach at Grand Isle. The defendant drove the victim's car to and from the beach. (R. 103). After spending the day at the beach, and after taking Robichaux to his home, the defendant, the victim, and her children returned to the defendant's grandmother's home. The victim and her children again spent the night with the defendant.
According to the victim, on Sunday, May 23, 2004, the defendant left her and her children at the defendant's grandmother's home and drove away in the victim's car, stating he was going to church. At approximately 12:00 noon, the defendant returned. The defendant subsequently drove the victim, her children, and himself to church in the victim's car. Shortly after arriving at the church, the defendant spoke to a man. The defendant then told the victim to "get the kids and let's go." The defendant then drove the victim, her children, and himself to the defendant's mother's house in the victim's car. The defendant told the victim someone was looking for him in connection with a "probation thing."
Thereafter, the defendant drove the victim, her children, and himself to the defendant's grandmother's house in the victim's car. According to the victim, after they arrived, she asked the defendant for her car keys because she had to take her children home to get them ready for school the next day. The defendant became upset with the victim because he wanted her to spend the night. The victim pleaded with the defendant to give her back her car keys. Defendant told the victim that he did not have her car keys, but she did not believe him. The defendant asked the victim to go into the house and talk to him. She complied with his request, but left her children outside. The defendant begged the victim to stay overnight, but the victim refused. She told the defendant that she needed to tend to her children because they had school in the morning. The defendant then told her, "Well, I'm going to shoot you with my nine." The victim went back outside, telling the defendant she did not want her children to be outside by themselves. The defendant followed her outside. The victim continued to ask the defendant for her car keys, and he continued to refuse to return the keys. The victim stated, "Fine," and told the defendant he could have her car, but she was going home. The victim tried to run away from the defendant. The defendant, however, ran up behind the victim, grabbed her hair, and made her fall to the ground.
*430 The victim eventually returned to the defendant's grandmother's house with the defendant. The defendant told the victim, "Don't try to run again." He then acted as if he was calling the police. The defendant spoke into the telephone, and seemed to be inviting "the police" to come to his house because of a drug dealer in the house who had drugs in her car. After hearing that, the victim stated, "He's lying. He don't let us go home. Please help us."
The victim further testified, as follows: "[W]e kept trying to run. Every time we run (sic) he kept catching us." The victim asked the defendant to let her get her clothes and put them in her car. The defendant went into his grandmother's house, and the victim "snuck" into the house and took her clothes from the utility room. When the defendant found out the victim had taken her clothes out of the house, he spun the victim around, grabbed her throat, and stated, "Are you f'ing stupid?" The victim told the defendant she was going back outside and went outside. The defendant responded, "What do you think you are doing?[,]" and slammed the victim's head against a brick wall. During this altercation, the victim's oldest daughter, B.V., said, "Mama, come on, let's go home." The defendant then picked up B.V. by her head and threw her into the victim's car.
Thereafter, the defendant went into his grandmother's house, and the victim and B.V. ran to the next street. The defendant drove up to the victim and B.V. and told the victim to "[g]et in." The victim's two youngest children were in the car with the defendant. The victim refused, stating, "No. You can keep the car. I want my kids and I'm getting out. I'm going home. I'm walking home." The defendant again told the victim to get into the car, and she again refused. The defendant offered to let the victim drive. The victim and B.V. got into the car and drove in the direction of the defendant's grandmother's house, but stopped before reaching the house. The defendant demanded that the victim drive to the house, but she refused. The defendant and the victim struggled over the keys in the ignition, and the defendant pulled the victim's head down by her hair and put his hand in her mouth. The victim bit the defendant's hand. The defendant punched the victim in the face and bit her left wrist. The defendant then jumped out of the car and ran to his grandmother's house. The victim drove away with her children. She denied ever threatening or attempting suicide. She denied jumping out of a car on the night of the incident. She also denied that the defendant told her that someone from Baton Rouge was coming to pick him up and she had to leave.
The victim identified State Exhibit # 1 as a photograph depicting a bruise and a bite caused by the defendant punching her in the face and biting her. The victim identified State Exhibit # 2 as a photograph depicting a bruise on her eye caused by the defendant punching her in the face. The victim identified State Exhibits # 3 and # 5(B)-# 5(D) as photographs depicting the bite on her arm caused by the defendant. The victim identified State Exhibit # 4 as a photograph depicting swelling of her throat caused by the defendant grabbing her throat. The victim identified State Exhibits # 5(A) and # 5(E)-# 5(H) as photographs depicting the "black eye" the defendant gave her. The victim identified State Exhibit # 5(I) as a photograph depicting swelling to her neck caused by the defendant.
B.V. also testified at trial. She was nine years old at the time of her testimony. She gave the following account of the events surrounding the incident. The victim went to pick up the defendant from *431 "somewhere" after school. The defendant asked the victim and her children to sleep over and they agreed. The next day, the victim washed some clothes. "Whenever it started to get dark," the victim wanted to leave because her children had school the next day, but the defendant did not want to give the victim her keys. When the victim went to get her clothes out of the laundry, the defendant grabbed her by the leg and pulled her away from the dryer. The defendant asked the victim to go to his room so that they could talk. While the victim and the defendant were in the defendant's room, B.V. took "the keys" from the top of the deep freezer and hid them under the seat of the car. According to B.V., the victim saw that the keys were no longer on top of the deep freezer, so the victim knew B.V. had the keys when the victim finished talking to the defendant. The victim got into her car and attempted to leave, but the defendant grabbed her by the hair and threw her against a brick wall. B.V. told the defendant to stop hitting the victim, and the defendant picked B.V. up by her head, threw her into the car, and closed the car door on her foot. The victim told her children to "get out of the car so [they] could run." The victim and her children got out of the car and ran, but the defendant drove up to them. The defendant told the victim and her children to get into the car, but the victim refused. However, the victim and her children got into the car after the defendant said he would let the victim drive. The defendant told the victim to drive to "his" house, but the victim drove only to a stop sign. The defendant demanded that the victim go under "his" carport, but the victim refused. The defendant "got upset" and tried to take the car keys from the victim, but she kept holding them. The defendant put his fist in the victim's mouth and bit her arm. Also during the struggle for the keys, the key chain broke, and the keys fell onto the floor. The defendant then got out of the car and ran into "his" house. The victim picked up the car key from the floor, started the car, and drove away.
The victim's son, C.V., also testified at trial. He was eight years old at the time of his testimony. He indicated that he, his two sisters, and the victim slept over at the defendant's grandmother's house one day, and the defendant wanted them to sleep over again. The victim, however, wanted to go back to her house because C.V. and his sisters had to go to school. The defendant "got mad" and started beating up the victim. The victim ran away from the defendant, but the defendant pushed her down and pulled her by the hair. The defendant went back to his grandmother's house, but then returned and told the victim that she could drive. The victim wanted to drop the defendant off at the stop sign, and the defendant "got mad." The defendant pushed his hand in the victim's mouth and bit her. He also "broke the key." Defendant then got out of the car, and ran to his house. C.V. indicated that the victim did not bite the defendant when he put his hand in her mouth. C.V. also denied that the victim had any pills on the night of the incident.
Dr. Jay Clement Alexius, Jr. testified that he worked at Terrebonne General Hospital Emergency Room and treated the victim on May 24, 2004. The victim was suffering from a facial contusion, a human bite, and muscular back pain, which may have been chronic. The victim complained that an acquaintance had grabbed her by the throat, had hit her over her left eye, and had bitten her on her left wrist.
Travis Sanford testified that on May 23, 2004, he worked for the Terrebonne Parish Sheriff's Office. On that date, the defendant advised Officer Sanford that the defendant and the victim had broken up, the *432 victim had threatened suicide, and the defendant was concerned that the victim might commit suicide. The defendant told Officer Sanford the victim might claim the defendant had beaten her up, but that would be a lie.
Officer Sanford located the victim in the emergency room of Terrebonne General Hospital. The victim indicated she had had an altercation with the defendant after she decided she wanted to leave "the house," and the defendant did not want her to leave. The victim indicated that the defendant had her car keys and would not give them to her. She also stated that the defendant had tackled her, thrown her to the ground, hit her, and, when she tried to run away, he "drug her back to the residence." Officer Sanford noticed that the victim had a bite mark on her left wrist, had a clump of hair missing from her head, had bruising and swelling on her left eye, and had a big knot on her forehead. The victim told Officer Sanford that the defendant had inflicted her injuries.
The defendant also testified at trial. He claimed he had a relationship with the victim, which lasted approximately eighteen days, in the spring of 2004. He claimed the victim would come to the house he shared with his grandmother at approximately 2:00 a.m. or 3:00 a.m., stay at the home until approximately 5:00 a.m. or 6:00 a.m., "put her kids on the bus," and then come back to the house and "do whatever [the defendant] had for [the victim] to do." He claimed he did not have a sexual relationship with the victim, and he paid the victim for work she did at "his" house. The defendant claimed that during his relationship with the victim, the victim was aware that he had a girlfriend, Michelle Thomas, who lived in Baton Rouge.
The defendant claimed he spent May 22, 2004 at the beach with the victim, her children, and Danny Robichaux until the victim left at about 4:00 p.m. to go to work. He claimed that the victim called him on his cellular telephone at approximately 7:00 p.m., and wanted to come to see him. He claimed he refused, telling the victim that he was not at home, was not going to be at home, and, if he decided not to remain at his present location, he would go to Baton Rouge.
According to the defendant, when he woke up at approximately 8:30 a.m. on Sunday, May 23, 2004, the victim and her children were at "his" house. The defendant claimed the victim had allowed him to drive her car to church. For that reason, he took the victim's car to church that morning while the victim and her children slept. After the defendant returned from church, he stayed at the house. The victim washed clothes and got her children ready for school. At approximately 3:30 p.m., the defendant drove the victim and her children to the defendant's mother's house in Schriever. According to the defendant, before he arrived at his mother's house, the victim attempted to jump out of the car. The defendant pulled the victim back into the car. He indicated that he thought "it was a joke[,]" and that he believed that the victim also thought "it was a joke."
After visiting the defendant's mother, the defendant, the victim, and her children went to church. According to the defendant, one of his friends pulled a prank on him at church. The friend told the defendant that he had missed a court date and a warrant had been issued for defendant's arrest. The defendant had the victim and her children get into the car, and drove them back to his mother's house. The defendant claimed that he stopped at his mother's house, and then he and the victim and her children went to the Shop Rite in Schriever. The defendant claimed the victim became upset with him at the *433 store after he gave an old girlfriend some money for gas. He claimed the victim also became angry after they went back to his grandmother's house and he spoke to Thomas on the telephone and told her to "hurry up and send somebody to come get [the defendant]." The defendant claimed the victim was "devastated." He testified that he told the victim to take her children and get away from "his" house. He also claimed that one of the victim's children subsequently told defendant to go outside because the victim had defendant's medicine.
According to the defendant, when he went outside, he found the victim standing in the middle of his front yard. She was saying that she was not good enough for him. He claimed that the victim was very angry, was crying hysterically, and was holding what appeared to be one of his pill bottles in her hand. He claimed that the bottle was not open at that time. He told the victim not to do something stupid, and that she was going to wake up his grandmother and his neighbors. According to the defendant, moments later, the victim had placed several of his Soma pills in her mouth and spilled the rest of the pills on the ground. The defendant claimed that he placed his index and middle fingers inside the victim's mouth and "raked out" three pills. He asserted that when he did that, the victim bit him "like a dog." He claimed that he and the victim then "kind of had a little wrestling match, cursing match." Next, he went inside and called the police. He testified that the victim went to her car, and got in while "screaming and hollering, claiming she was going to go commit suicide." He denied trying to keep the victim and her children at his home or doing anything that could be construed as kidnapping the victim. He denied biting the victim on her wrist or intentionally hurting her. He also denied giving the victim a black eye. He claimed he told the police that the victim might say he beat her up because she had "lied on" her ex-husband on several occasions.
Lanita Templet, the defendant's mother, also testified at trial. She stated that the defendant, the victim, and her children came to the grandmother's house on May 23, 2004, and they seemed upset. Templet claimed that the victim and "the little girl" told Templet that the victim had tried to jump out of the car at the railroad tracks. Templet testified that after the victim calmed down, the defendant, the victim, and her children left to go to church. Templet indicated that the defendant subsequently told her that the victim had bitten him when he put his finger in her mouth to remove the pills she had taken.
Mardis Sanders, the defendant's grandmother, also testified. She claimed at approximately 10:30 p.m. or 11:00 p.m. on May 23, 2004, her dog awakened her at her home. She looked outside and saw the victim's three children sitting on a swing, and the defendant and the victim sitting on another swing. The victim was crying. Sanders claimed she went back to bed.
According to Sanders, she subsequently overheard the defendant telling the victim that he wanted to go to Baton Rouge, and the victim begging the defendant not to go to Baton Rouge. Sanders claimed the defendant was trying to get the victim to leave and that "Michelle" was coming to the house to pick up the defendant. Sanders claimed, at approximately 12:00 midnight, she saw the victim put a bathing suit and a set of car keys on the table. Sanders testified that she subsequently heard one of the victim's children tell the defendant, "Mommy is taking some pills." Sanders claimed that the defendant rushed outside, returned with a bleeding finger, and told Sanders that the victim was trying *434 to take some pills. Sanders also claimed that the defendant wore partial dentures for four bottom teeth, and he could not find his dentures when he was arrested. However, Sanders testified that she found the defendant's dentures in the pocket of his pajamas, two days after his arrest.

SUFFICIENCY OF THE EVIDENCE
In assignment of error number 1, the defendant argues that his claim, that he attempted to prevent the victim from committing suicide, was corroborated by the testimony of Lanita Templet and Mardis Sanders. He also argues that there was insufficient evidence that he kidnapped the victim by taking her car keys and physically abusing her.
In reviewing claims challenging the sufficiency of the evidence, this court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). See also LSA-C.Cr.P. art. 821(B); State v. Mussall, 523 So.2d 1305, 1308-09 (La. 1988).
Second degree kidnapping is the imprisoning of any person wherein the victim is physically injured. LSA-R.S. 14:44.1(A)(3) & (B)(3). For a conviction, LSA-R.S. 14:44.1(B)(3) requires neither movement of the victim, nor that the imprisonment exists for any minimum period of time. State v. White, 593 So.2d 882, 887 (La.App. 2 Cir.1992).
After a thorough review of the record, we are convinced that viewing the evidence in the light most favorable to the state, any rational trier of fact could have found beyond a reasonable doubt that the defendant was guilty of the second degree kidnapping of the victim. The verdict rendered against the defendant indicates that the jury accepted the testimony of the state's witnesses, including the victim's account of the incident, and rejected the testimony of the defense witnesses, including the defendant's account of the incident.
This court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt. The testimony of the victim alone is sufficient to prove the elements of the offense. The trier of fact may accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Lofton, 96-1429, p. 5 (La.App. 1 Cir. 3/27/97), 691 So.2d 1365, 1368, writ denied, 97-1124 (La.10/17/97), 701 So.2d 1331.
This assignment of error is without merit.

REVIEW FOR ERROR
Our review for error is conducted pursuant to LSA-C.Cr.P. art. 920. Specifically, article 920 provides that the only matters to be considered on appeal are errors designated in the assignments of error and "error that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence." LSA-C.Cr.P. art. 920(2).
In the instant case, the trial court failed to deny the defendant parole for at least two years of the sentence. See LSA-R.S. 14:44.1(C). The sentencing error cannot be remedied on appeal under LSA-R.S. 15:301.1(A) because "at least" two years of *435 the sentence imposed are required to be without benefit of parole, probation, or suspension of sentence. See State v. Moore, 37,935, pp. 15-16 (La.App. 2 Cir. 1/28/04), 865 So.2d 227, 236, writ denied, XXXX-XXXX (La.7/2/04), 877 So.2d 142. Thus, that aspect of the sentence involves discretion by the sentencing judge, and, although the defendant is not prejudiced by this sentencing error, we believe the sentence must be vacated and remanded. Accordingly, we vacate the sentence and remand to the trial court for resentencing.[1]
CONVICTION AFFIRMED; HABITUAL-OFFENDER ADJUDICATION AFFIRMED; SENTENCE VACATED AND REMANDED FOR RESENTENCING.
NOTES
[1] Having vacated the sentence, we pretermit assignment of error number 2. However, we do note that in the sentence the trial court imposed a fine of $1,000.00. However, neither LSA-R.S. 14:44.1 nor LSA-R.S. 15:529.1 authorized such a fine.