# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**09-143**


**STATE OF LOUISIANA**

**VERSUS**

**BACARDNY WAYNE GEORGE**


**\*\*\*\*\*\*\*\*\*\***


APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 07-1162
HONORABLE EDWARD LEONARD  JR., DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***


**ELIZABETH A. PICKETT**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***


Court composed of Michael G. Sullivan, Elizabeth A. Pickett, and Billy Howard Ezell, Judges.

**AFFIRMED.**


**J. Phillip Haney**
**District Attorney, 16TH Judicial District**
**Jeffrey J. Trosclair**
**Assistant District Attorney**
**300 Iberia Street, Suite 200**
**New Iberia, LA 70560**
**(337) 369-4420**
  **Counsel for State-Appellee:**
  **State of Louisiana**

**William Jarred Franklin**
**Louisiana Appellate Project**
**3001 Old Minden Road**
**Bossier City, LA 71112**
**(318) 746-7467**
  **Counsel for Defendant-Appellant:**
  **Bacardny Wayne George**

**PICKETT, Judge**._____

## FACTS

On April 12, 2007, retired prosecutor Ralph Lee was sitting in a swing in his back yard in New Iberia, drinking his morning coffee. Around 7:10 a.m., he heard a female voice coming from City Park, located adjacent to the back yard of his home, saying, "stop, you're killing me, stop, you're killing me." Lee stood up, turned around and saw a black male wearing a white t-shirt holding something over his head and forcefully smashing it to the ground. Lee went through a gate from his yard into a short street leading to the park and saw the man again raise something over his head and smash it to the ground. Lee heard a "splat," like "when you slap wet hamburger meat on a counter."

As Lee entered the park, he saw the man standing over what appeared to be a human, lying on the ground. The man had his hands on his knees and was looking at the person on the ground, "bending over looking at whatever he had done." When the chain link gate rattled, the man looked up and began walking toward an older model green Cadillac parked in the "tear drop" area of the park. The man looked directly at Lee once, and Lee was able to see his face "very well."

Lee was also able to plainly see the license plate on the car, OOU 586. Lee was unarmed, and, being a former assistant district attorney, understood the importance of being able to get away with the license plate information. No one else was in the park; Lee realized that "if [he] went down there was no witness left." The man got in the car and "drove off, very calmly, like nothing had happened."

1

When Lee went to the person on the ground, he found a black female, lying on her stomach, and "her head was an absolute mess." Lee thought she was dead. He jogged back to his house and called 911.

Deputy Jeff Credeur arrived at the park at 7:23 a.m. He found paramedics treating the woman and noted she had a severe head injury. Lee gave Deputy Credeur the car's license plate number, and Deputy Credeur had Deputy Brimm run the plate. The 1999 green Cadillac was registered to the defendant, Bacardny George.

Detective Jeff Matthews located the green Cadillac at the defendant's workplace, Superior Inspection Services, about a twenty-minute drive from the park. The vehicle was placed in secure storage, and Detective Matthews tested areas in the vehicle for blood. The tests were positive.

Around the same time, Ralph Lee identified the defendant from a photo lineup as the person he had seen that morning in the park. At trial, Lee further identified the defendant as the man in the park and in the photo, although he believed the defendant was "a little lighter" in the courtroom than he had been at the time of the attack. Lee had no doubt that the defendant was the man he had seen that day in the park.

Meanwhile, Nicole Watkins was "bleeding very actively" in the emergency room of the Dauterive Hospital. Dr. Kevin Chamas, medical director and physician at the hospital, found seventy-five severe lacerations to Watkins' head. He considered her condition life-threatening without treatment, and described her injuries as "so extensive it was pretty difficult" to provide her the proper treatment. Watkins was responding only to pain when she arrived, unable to verbalize recognizable words. Dr. Chamas described her injuries as "facial edema over both eyes and then the right cheek, right lip and then large flap lacerations to her posterior scalp." The

2

scalp lacerations "were extremely severe and deep and actually at first it was really difficult to realize how bad they were." As Dr. Chamas was repairing lacerations, he "just kept finding new lacerations and she had a total of about seventy-five (75) severe lacerations." Describing the lacerations, Dr. Chamas said "they were severe as I had ever seen."

A CAT scan showed Watkins had bleeding into the right frontal region of her brain. Her injuries were to both the front and back of her head. Because no neurosurgeon was available, Dr. Chamas repaired the extensive lacerations as quickly as he could and prepared Watkins for transfer to Lafayette General Hospital.

Dr. Chamas testified it was unusual for him to stay at a patient's bedside for more than an hour. He was at Watkins' bedside, providing "critical and extensive care," for more than two hours. He considered her injuries consistent with being struck in the head with large rocks. Forensic testimony at trial showed the presence of Watkins' blood on a concrete block that weighed seventeen pounds, twelve ounces; another concrete block found in the area with blood on it weighed eighteen pounds and nine ounces.

At trial, the twenty-five-year-old Watkins testified she has an eleventh grade education, lives with her mother and others, and has two children, ages five and nine. She takes medication for seizures resulting from "what happened to [her]." She does not recall being in the park, but knows she was in a black Jeep and smoked crack cocaine on the night before the attack. She knows she has "a whole lot" of scars on her head, and she has dreams about the attack.

The jury found the defendant guilty of attempted second degree murder on August 13, 2008. The next day, the state charged the defendant with being a second

3

felony offender, based on his January 26, 2004 conviction for attempted possession with the intent to distribute cocaine. The trial judge adjudicated the defendant a second felony offender at proceedings on October 8, 2008, and sentenced him as such to eighty years at hard labor without benefit of probation, parole or suspension of sentence.

## ASSIGNMENTS OF ERROR

1.    There is insufficient evidence to prove the guilt of defendant for the offense of attempted second degree murder beyond a reasonable doubt.

2.    The trial court erred in allowing photographs of the alleged victim into evidence.

3.    The sentence imposed is excessive for this offender and offense.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find there are no errors patent.

## ASSIGNMENT OF ERROR NUMBER ONE

The defendant contends the evidence was insufficient to prove his guilt of attempted second degree murder beyond a reasonable doubt. The standard of review in a sufficiency of the evidence claim is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." *State v. Leger*, 05-11, p. 91 (La. 7/10/06), 936 So.2d 108, 170, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279 (2007) (*citing Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979)); *State v. Captville*, 448 So.2d 676 (La.1984). The essential elements of the crime of attempted second degree murder are a specific intent to kill the victim and

4

the commission of an overt act that tends toward the accomplishment of the victim's death. La.R.S. 14:30.1; *State v. Hollingsworth*, 42,317 (La.App. 2 Cir. 8/15/07), 962 So.2d 1183.

The defendant's argument is twofold. He contends the state failed to negate every reasonable probability of misidentification and also failed to establish the defendant possessed the requisite specific intent to kill. We find the state presented sufficient evidence on each point.

Identification of Defendant

When the key issue is not whether a crime occurred, but rather, the identity of the perpetrator, the state is required to negate any reasonable probability of misidentification. *State v. Hughes*, 05-992 (La. 11/29/06), 943 So.2d 1047. One witness's positive identification is sufficient to support a conviction. *Id.*

Ralph Lee was an eyewitness to the attack. He picked the defendant from a photo lineup only hours after the man in the park looked directly at Lee as he was walking to the green Cadillac.[1] Although the defendant appeared somewhat lighter at the time of trial, Lee had no doubt he was the man Lee saw in the park.

In addition to Lee's positive identification, other evidence supports the jury's determination that the defendant was Watkins' assailant. The man in the park drove away in the defendant's vehicle around 7:10 a.m. The same vehicle was located at the defendant's place of employment, about a twenty-minute drive from the park. The defendant's work time sheet showed he clocked in at 7:38 a.m. the day of the attack. When Deputy Credeur learned the green Cadillac was registered to the

---

[1] The defendant's brief erroneously states the photo lineup identification occurred two weeks after the attack. In fact, Lee testified he viewed the lineup and chose the defendant's picture from it the same morning of the attack. State's Exhibit 1 also shows the date on the photo lineup as "Thu Apr 12 10:32 CDT 2007." Lee's initials and date, "RKL 4/12/07" appear on the top center photo.

5

defendant, he first went to the defendant's home. There, he learned the defendant had never returned home on the prior evening. When Deputy Credeur interviewed the defendant, he first said he had slept at his house that night. However, the defendant then said he slept in a Wal-Mart parking lot, and then changed his story to say he had slept in the old Wal-Mart parking lot. Although neither the DVD nor a transcript of Deputy Credeur's interview with the defendant appears in the record on appeal, the interview was played to the jury at trial.[2]

Forensic evidence showed the presence of Watkins' blood in the green Cadillac. Winnie Kurowski, a forensic chemist who focuses her work at the Acadiana Criminalistics Laboratory in New Iberia on biological fluids, compared blood samples found on one of the concrete blocks and on the passenger seat in the green Cadillac to reference samples of Watkins' blood. Kurowski testified the DNA in all three samples matched, and that the probability that anyone else would have the same DNA profile as Watkins was one in ninety-three quadrillion.

The defendant correctly states his DNA was not found on any of the items submitted to the crime lab. However, the absence of the defendant's DNA does not negate the considerable evidence on which the jury could reasonably determine the defendant's identity as the offender. The defendant further argues "it is probable" that someone else was driving the defendant's car at the time of the incident. It is not reasonable to surmise that an unknown borrower (of which there is no evidence) used the defendant's vehicle, attacked Watkins and somehow delivered the vehicle to the defendant's place of employment with Watkins' blood in it while the defendant spent the night in a parking lot and arrived at work at 7:38 a.m. the morning of the attack.

---

[2]Portions of the taped interview dealing with evidence of other crimes were not played to the jury.

6

Accordingly, we find the jury was entirely reasonable in determining the defendant to be Watkins' assailant.

Specific Intent

Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). The specific intent to kill is an essential element of the crime of attempted second degree murder. La.R.S. 14:27, 14:30.1; *State v. Hongo*, 96-2060 (La. 12/2/97), 706 So.2d 419. The state does not have to prove specific criminal intent as a fact; it may be inferred. *State v. Maxie*, 93-2158 (La. 4/10/95), 653 So.2d 526. The defendant here argues that, in the event this court finds the state met its burden as to identification of the defendant, it failed to prove his requisite specific intent, that he actively desired to kill Watkins.

The defendant seems to argue that, because Lee saw the defendant strike Watkins twice with the concrete blocks, she was only hit twice, and that two strikes could not cause the serious injuries she sustained. Thus, the defendant argues it was "reasonable to assume Watkins sustained some, if not a majority of the wounds" prior to her arrival at the park. This argument defies reason. The fact that someone witnessed only two blows by the defendant does not lead to the conclusion that the defendant struck Watkins only twice. Indeed, Lee investigated because he heard Watkins say, "stop, you're killing me, stop, you're killing me," indicating she had already been violently attacked before Lee saw the defendant smashing an object to the ground and heard the "splat" of it hitting Watkins. Lee found Watkins lying in a pool of blood next to two large concrete blocks covered in blood. Dr. Chamas testified Watkins had injuries as severe as he had ever seen that resulted in very active

7

bleeding and bleeding inside her brain. Her condition was life-threatening without treatment. Yet, the defendant argues those severe, life-threatening injuries occurred before Watkins' arrival at the park, and that the extent of Watkins' injuries is insufficient to support a finding of specific intent to kill absent proof that the defendant inflicted all of the wounds.

The severity of a victim's injuries may be probative in proving the defendant's intent to kill. *State v. Green*, 484 So.2d 698 (La.App. 1 Cir. 1985), *affirmed*, 493 So.2d 1178 (La.1986). The evidence here was sufficient for the jury to find the defendant's actions showed he had the specific intent to kill Watkins, even if the only injuries he inflicted were the two blows to Watkins' head immediately before she was found.

Summary

Lee, an eyewitness to the attack on Watkins, had no doubt the defendant was the man he saw smash concrete blocks into Watkins with great force and drive away in the green Cadillac. Other evidence supports Lee's identification of the defendant as Watkins' assailant. The evidence presented to the jury allowed it to rationally find proof beyond a reasonable doubt of each of the essential elements of the crime charged. This assignment of error is without merit.

**ASSIGNMENT OF ERROR NUMBER TWO**

The defendant alleges the trial court erred by allowing photographs of the victim into evidence. He claims the effect of the graphic photographs was overly prejudicial, and that the state introduced the photographs as a substitute for other, sufficient evidence in an effort to inflame the jury's emotions.

8

"Generally, photographs are admissible in evidence when they are shown to have been accurately taken, to be a correct representation of the subject in controversy, and when they shed light upon the matter before the court." *State v. Strickland*, 398 So.2d 1062, 1065 (La.1981). Photographs are admissible in a criminal prosecution when their probative value outweighs their probable prejudicial effect. *State v. Robinson*, 02-1869 (La. 4/14/04), 874 So.2d 66, *cert. denied*, 543 U.S. 1023, 125 S.Ct. 658 (2004); La.Code Evid. art. 403. Louisiana courts routinely allow gruesome and graphic photographs into evidence in such circumstances.

For example, photographs from an autopsy showing bullet wounds in the victims' bodies were held admissible in *State v. Dunn*, 01-1635 (La. 11/1/02), 831 So.2d 862. In *State v. Hoffman*, 98-3118 (La. 4/11/00), 768 So.2d 542, *opinion supplemented* 00-1609 (La. 6/14/00), 768 So.2d 492, *cert. denied*, 531 U.S. 946, 121 S.Ct. 345 (2000), crime scene photographs were deemed relevant and admissible to show the manner of death and the location of the victim's body. Additional autopsy photographs were allowed to show details of the victim's gunshot wound and other injuries. The *Hoffman* court commented that photographic evidence is admissible "unless it is so gruesome that it overwhelms jurors' reason and leads them to convict without sufficient other evidence." *Id.* at 566.

Here, five photographs of Watkins' wounds were admitted into evidence at trial.[3] The photographs were taken by Deputy Credeur at Dauterive Hospital while Dr. Chamas was providing care to Watkins. They showed the lacerations inflicted by the blows and the resulting disfigurement and swelling to Watkins' face and head.

---

[3]The same five photographs were designated S-1, 2 and 3 during the preliminary examination to preserve the testimony of Dr. Kevin Chamas, who was moving to California and would be unavailable for trial.

The trial court admitted the photographs, noting they "tend[ed] to show the severity of injuries and perhaps intent."

The photographs, while graphic and unpleasant to view, accurately depict Watkins' injuries and "shed light upon the matter before the court." *Strickland*, 398 So.2d at 1065. They are relevant, as noted by the trial court, to show the extent of Watkins' injuries. The record contains nothing to suggest the photographs caused the jury to convict the defendant without sufficient evidence. We find this assignment of error is without merit.

## ASSIGNMENT OF ERROR NUMBER THREE

The defendant argues the sentence imposed is excessive. After the jury found him guilty of attempted second degree murder the defendant was adjudicated a second felony offender and sentenced to eighty years at hard labor without benefit of probation, parole or suspension of sentence. Louisiana Code of Criminal Procedure Article 881.1(A)(1) requires a defendant to make or file a motion to reconsider his sentence within thirty days of imposition of the sentence. A defendant who fails to make or file such a motion is precluded from raising any objection to the sentence on appeal. La.Code Crim.P. art. 881(E); *State v. White*, 03-1535 (La.App. 3 Cir. 4/28/04), 872 So.2d 588; *State v. Prudhomme*, 02-511 (La.App. 3 Cir. 10/30/02), 829 So.2d 1166, *writ denied*, 02-3230 (La. 10/10/03), 855 So.2d 324. The defendant here did not make or file a motion to reconsider his sentence in the trial court. Nevertheless, we review his argument as a bare claim of excessiveness. *State v. Baker*, 08-54 (La.App. 3 Cir. 5/7/08), 986 So.2d 682.

This court has set out a standard to be used in reviewing excessive sentence claims:

> La.Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00-0165 (La.6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

*State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331 (alteration in original).

To decide whether a sentence shocks the sense of justice or makes no meaningful contribution to acceptable penal goals, this court has held:

> [An] appellate court may consider several factors including the nature of the offense, the circumstances of the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes. *State v. Smith*, 99-0606 (La.7/6/00), 766 So.2d 501. While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste*, 594 So.2d 1 (La.App. 1 Cir.1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La.5/31/96), 674 So.2d 957, 958.

*State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061.

The nature of the offense here is attempted second degree murder, a violent crime with violent circumstances. The defendant is a second felony offender

11

convicted in 2004 of attempted possession of cocaine with the intent to distribute and sentenced to five years at hard labor, suspended and placed on probation.

A third felony offender received the maximum one-hundred-year sentence for attempted second degree murder in *State v. Fields*, 42,761 (La.App. 2 Cir. 1/9/08), 973 So.2d 973, *writ denied,* 08-469 (La. 9/26/08), 992 So.2d 983. This was an especially brutal crime where the defendant stabbed his girlfriend more than fifty times.

The defendant in *State v. Hailey*, 41,897 (La.App. 2 Cir. 2/28/07), 953 So.2d 979, *writ denied*, 07-1024 (La. 11/16/07), 967 So.2d 522, was convicted of attempted second degree murder as a fourth felony offender. He received a sentence of eighty-seven years at hard labor.

In *State v. Douglas*, 39,036 (La.App. 2 Cir. 10/29/04), 888 So.2d 982, *writ denied*, 04-3146 (La. 4/1/05), 897 So.2d 601, the defendant was not adjudicated a multiple offender, but he had a lengthy criminal record. He was sentenced to one hundred years at hard labor for attempted second degree murder, along with sentences of thirty years for aggravated burglary and ten years for sexual battery.

The defendant in *State v. Tyler*, 01-1038 (La.App. 5 Cir. 3/26/02), 815 So.2d 205, was a second felony offender convicted of attempted second degree murder. He was sentenced to sixty years at hard labor. The defendant stabbed his girlfriend seven times and also wounded her daughter.

In *State v. Moore*, 37,935 (La.App. 2 Cir. 1/28/04), 865 So.2d 227, *writ denied*, 04-507 (La. 7/2/04), 877 So.2d 142, the defendant was sentenced to forty years on a conviction of attempted second degree murder, to run consecutively with a sixty-five-year sentence for second degree kidnapping and a forty-year sentence for armed

robbery. He received eighty percent of the maximum possible sentence for attempted second degree murder.

This court, in *State v. Sampy*, 07-1059 (La.App. 3 Cir. 3/5/08), 978 So.2d 553, *writ denied*, 08-845 (La. 11/10/08), 996 So.2d 1066, upheld the conviction and sentence of a defendant with no criminal history. The defendant was convicted of attempted second degree murder and sentenced to thirty years at hard labor. The sentence ran concurrently with an additional ten-year sentence for the defendant's conviction for attempted manslaughter.

The defendant could have received a possible sentence of twenty-five to one hundred years as a second felony offender. La.R.S. 14:27, 14:30.1(B), 15:529.1. The eighty-year sentence imposed seems somewhat high when compared to comparable cases. However, this defendant committed an especially brutal crime that has left his victim with severe and permanent injuries. His sentence, while high, is not excessive under the circumstances.

### CONCLUSION

We find the evidence was sufficient to convict the defendant of attempted second degree murder. Further, the trial court did not err in admitting into evidence five photographs of Watkins' injuries which showed the extent and magnitude of her wounds. Although the defendant's sentence is high under the *Smith* analysis, the trial court did not abuse its broad sentencing discretion. Accordingly, the defendant's conviction and sentence are affirmed.

**AFFIRMED.**