990 So.2d 76 (2008)
STATE of Louisiana
v.
Jeremy COLBERT.
No. 2007-KA-0947.
Court of Appeal of Louisiana, Fourth Circuit.
July 23, 2008.
*78 Eddie J. Jordan, Jr., District Attorney, Alyson R. Graugnard, Assistant District Attorney, New Orleans, LA, For State of Louisiana.
Kevin V. Boshea, Metairie, LA, for Jeremy Colbert.
(Court composed of Judge JAMES F. McKAY, III, Judge MICHAEL E. KIRBY, Judge Pro Tempore MOON LANDRIEU).
MOON LANDRIEU, Judge Pro Tempore.
The defendant-appellant, Jeremy Colbert, was indicted for the second degree murder of Jonathan Jefferson and the attempted second degree kidnapping of Jennifer Alexander. He pled not guilty to both counts. The State filed a notice of intent to introduce evidence of other crimes. Following several pre-trial hearings on the issue, the trial court ruled, allowing some of the evidence. The defense noted its intent to seek a writ on the trial court's ruling, and this court subsequently denied the writ. State v. Colbert, unpub. XXXX-XXXX (La.App. 4 Cir. 6/1/05).
On March 7, 2007, at the conclusion of a three-day trial, a twelve-person jury found Colbert guilty of manslaughter and guilty as charged of attempted second degree kidnapping. After denying Colbert's motions for a new trial, a post verdict judgment of acquittal, and in arrest of judgment, the trial court sentenced him to serve forty years at hard labor for the manslaughter conviction and twenty years *79 at hard labor without benefit of parole, probation, or suspension of sentence for the kidnapping conviction, the sentences to run concurrently. Colbert appealed.

FACTS
Jonathan Jefferson was shot and killed on October 13, 2003, while standing in the parking lot of an apartment complex at 7700 Downman Road. An autopsy revealed that Jefferson sustained six gunshot wounds, one of which was to his right temple and resulted in his death. The forensic pathologist who conducted the autopsy stated that the shots were inflicted within twenty-four inches of Jefferson's body, as there was gunpowder residue on Jefferson's skin. He also testified that an analysis of Jefferson's bodily fluids was negative for alcohol or drugs.
LSP Trooper Kevin Curlee testified that at approximately 12:30 a.m. on October 13, 2003, he and his partner were on patrol when they heard the NOPD broadcast of a shooting in the 7700 block of Downman. They began canvassing the area, and as they turned onto Alabama Street, they saw a man who fit the description of the perpetrator. The man ran from the officers and darted between two houses. Trooper Curlee stated that he called for backup, and the officers blocked the surrounding streets. Trooper Curlee testified that he went into one of the back yards in the area and saw the defendant Jeremy Colbert lying on the ground between a fence and a car parked in the driveway. Trooper Curlee apprehended Colbert. Soon thereafter, another officer arrived with a woman who was a witness to a shooting nearby. That woman positively identified Colbert as the shooter. Trooper Curlee testified Colbert was the only person he and his partner saw on the street that night.
On cross-examination, Trooper Curlee testified that he and his partner did not go to the scene of the shooting and did not see the victim. He testified that he was not sure if there had been an earlier call of shooting in the area before the shooting in this case. He stated that a gun was found in a back yard in the area a few days after the shooting.
Off. Avery Theard testified that he also responded to the call of the shooting in the 7700 block of Downman. He testified that as he approached the gate of the complex at the corner of Wales Street and Downman, he saw a car come speeding out of the gate. He tried to stop the car, but it sped away. It then took a U-turn and came back. A man exited the car and told the officer that someone had been shot. Off. Theard testified that he went to the car and saw a man with gunshot wounds lying inside. He testified that he called for EMS personnel. When they arrived, they took the victim to the hospital. Off. Theard returned to the parking lot and secured the area.
On cross-examination, Off. Theard testified that he had received an initial call of shots being fired in the area, and then there was a second call stating that someone had been shot. He testified that when he entered the parking lot, he saw the victim's white car parked next to a red Mustang. Off. Theard testified that he did not find any weapons on the scene. He stated that he did not remember if he asked Jennifer Alexander, the witness, if she had a gun.
Det. Gregory Powell testified that the police first received a call of gunshots in the area of Downman and Alabama. He testified that as he was approaching the area, he received a second call concerning a person down at 7700 Downman. He testified that he went to the scene of the shooting and met with Jennifer Alexander, who was standing outside in the parking lot. He stated that Ms. Alexander told *80 him that her friend Jonathan Jefferson had been shot by Colbert, whom she indicated was her ex-boyfriend and the father of her daughter. Det. Powell testified that Ms. Alexander gave the officers Colbert's description and told them that he had fled towards Alabama Street. Ms. Alexander then showed him where the shooting had occurred and identified a red Mustang as her car, an Oldsmobile as Jefferson's car, and a Pontiac as Colbert's car. Det. Powell testified that all three cars were parked near the entrance to the parking lot. He testified that after he received a call that a suspect had been captured, he took Ms. Alexander to the scene of the apprehension in the 7700 block of Alabama. There, Ms. Alexander identified Colbert as the person who shot Jefferson.
Det. Wendell Russ testified that he was the lead investigator on the scene of the murder. He testified that he found the driver's door of the victim's car open, and he could see blood on the driver's seat and on the ground outside. He testified that he spoke with both Ms. Alexander and her stepfather, Mr. Roussel, and he took taped statements from both of them. Det. Russ testified that he later advised Colbert of his rights when he interviewed him at the police station. He testified that Colbert indicated that he understood his rights and wanted to wait until he had spoken with an attorney before making any decisions. Det. Russ testified that even after so indicating on the waiver form, Colbert then told them that he was walking in the area of Alabama and Curran when someone began shooting at him, and he ran from the scene. Det. Russ testified that this short statement was not recorded. He also testified that a set of keys belonging to Ms. Alexander was seized from Colbert.
Det. Powell testified that Ms. Alexander pointed out Colbert's car on the scene of the shooting, and he obtained a search warrant for the car. Inside the car, officers seized a photograph of an African-American female, an Auto Zone receipt in Colbert's name, a criminal district court order of release in his name, and an auto title form. He testified that although no weapons were found on the night of the shooting, a few days later officers walking the area found a .357 caliber revolver under a pile of lumber in the back yard of a house near where Colbert was captured. He testified that several casings were found near Wales and Alabama as well as on Downman Road.
Off. Aven Cooper of the crime lab testified that he processed the scene at 7713 Alabama, where the gun was found. He testified that officers also found a black nylon scarf on the scene. Off. Millet Green of the crime lab testified as to photographs he took at the scene of the murder. Off. Ed DeLery of the crime lab testified that he processed a Pontiac pursuant to a search warrant and lifted forty-three partial latent fingerprints, twenty-six from the car's exterior and seventeen from the interior. He indicated that the car was negative for any firearms evidence or obvious bloodstains.
Off. Kenneth Leary, an expert in ballistics and firearm identification, testified that he compared casings and bullets fired from the gun seized on Alabama to a bullet jacket recovered during the autopsy and bullet and jacket recovered from the victim at the hospital. He testified that the bullet and jackets recovered at both places were fired from the gun seized on Alabama Street.
The parties stipulated that Anna Duggar would testify that she tested the same gun and found no identifiable fingerprints on it. They also stipulated that a DNA sample taken from a bloodstain on Colbert's T-shirt was consistent with a sample taken *81 from him and inconsistent with a sample taken from Jefferson.
Jennifer Alexander began her lengthy testimony by describing her long-term relationship with Colbert that began while they were in junior high school. She testified that she became pregnant at age seventeen, and their daughter was born in 1999. She stated that their relationship was stormy throughout its duration. She testified that for a time after the baby was born she lived with Colbert at his mother's house, and some of the abuse she took from him occurred while they were living together there. She testified that on one occurrence in June 1999, they were arguing, and Colbert pushed her. She testified that Colbert's sister heard the argument and told Colbert to take a walk outside. Once he left, his sister locked the door, and she would not let him in when he returned. Ms. Alexander testified that she could not remember if anyone called the police during this incident. She then recounted another argument that occurred in November 2000 when she voiced her decision to leave him. She testified that the argument became violent, and Colbert bit her on the back and on her face. She testified that Colbert's family called her mother to come get her, and Colbert walked back and forth outside of the house, swinging a crowbar and telling everyone that no one could leave the house until he had spoken to Ms. Alexander.
Ms. Alexander testified that she eventually moved away, staying first with a friend and then getting an apartment at 7700 Downman Road, where she lived with her daughter. She testified that Colbert sometimes stayed with her, but she often put him out of the apartment. She testified that in January 2003, she went to Colbert's mother's house to pick up her daughter, and when she walked back outside, she saw Colbert standing near the gas cap of her car. She testified that the next morning she discovered that someone had put sugar in her gas tank. She testified that although she called the police during many of the incidents involving Colbert, she did not call them every time. Nonetheless, after one of the incidents an officer told her that she needed to get physical proof of Colbert's harassment. She testified that she bought a tape recorder, and in June 2003 she taped a telephone conversation they had when Colbert called her. The State played the tape for the jury, but its contents were not transcribed. Nonetheless, the tape apparently contained profane argument between the two, and in the tape Colbert accused Ms. Alexander of being involved in the theft of some rims from his car. She testified that Colbert also accosted her and accused her and her boyfriend of stealing the rims, and he hit her across the face with a gun during the incident. She also testified that she obtained at least one "stay away" order issued to Colbert.
Ms. Alexander testified that on October 12, 2003, the day before the shooting, she and her friend Nicole pulled into the parking lot of her apartment complex, and she saw a man ducking down into the bushes by the building. She testified that she decided to stay at her friend's house, and as she exited her friend's car and got into hers, Colbert walked up and knocked on her window, asking where she had been. She replied that her whereabouts were none of his concern, and he replied, "I got you. I got you." Colbert then walked away.
Ms. Alexander testified that the next day Colbert repeatedly called to threaten her. She testified that her mother and her stepfather came to her apartment because she was afraid to be there alone. She testified that that evening Jefferson, whom she had met a few weeks before and whom *82 she described as being just a friend, came over to her apartment to watch movies. She testified that she and Jefferson later left to get gas in her car. She testified that when they returned to the parking lot, Colbert walked up to her car and told her he wanted to talk to her. Ms. Alexander testified that she told Jefferson to get in his car but to call her in ten minutes. She testified that she also got into Jefferson's car to call her mother, who was inside her apartment. She stated that as Jefferson walked to the driver's side of his car, she heard a shot, and when she looked up, she saw Colbert shooting at Jefferson. She testified that Colbert then came to her side of the car, held a gun to her, and told her to get out of the car, threatening to kill her if she told anyone what had happened. She testified that Colbert then took her over to her car and tried to put her in the back seat. She stated that she told him their daughter was inside the apartment with her best friend, and she got away from him. She testified that she ran to her apartment door, and her mother opened the door. She testified that she then called 911. The State played the 911 tape for the jury.
Ms. Alexander testified that she and her stepfather went back outside, and they found Jefferson. She testified that they put him into her mother's car, and they started driving to a hospital when they saw the police. She testified they went back to the apartment complex, and Jefferson was transported by ambulance to the hospital. She testified that she saw Colbert's car at the entrance to the apartment complex. She was shown in court the scarf seized from the back yard of the house on Alabama Street, and she identified it as the doo rag that Colbert was wearing that night. She testified that she identified Colbert later that night a few blocks from the apartment complex, and she also gave a statement to the police that night.
On cross-examination, she testified that when she entered her apartment after the shooting, she told her mother and stepfather that Colbert had shot Jefferson, but she did not mention that he had tried to kidnap her by trying to put her into her car. She testified that as she and Colbert struggled at her car, he got her keys, and he followed her as she started to run toward her apartment. However, Colbert ran away when she reached the apartment and her mother opened the door. She insisted that her mother did not have a gun and that no one spoke to Colbert after the shooting because he ran away.
Defense counsel questioned Ms. Alexander at length about the contents of the taped conversation. She testified that she made the tape in the summer of 2003, just after Colbert had been released from prison. She testified that the boyfriend referred to in the conversation was a man named Wilbert, and she broke off the relationship with him due to harassment from Colbert. She testified that on the tape, when Colbert stated that he was going to "show her," she interpreted this statement as being a threat. She testified that although she did not tell Colbert that she was taping the conversation, he gave her the impression that he knew she was taping it. She testified that Colbert accused her of disrespecting him and always accused her of doing bad things. She stated that she told him that she did not have to speak with him except about their daughter. She testified that she gave the tape to the police a few days after she made it, and she reminded the police of the tape after the shooting. She also testified that shortly after the shooting, she briefly moved in with Colbert's sister.
Defense counsel questioned her about her use of a cell phone registered in Colbert's father's name. While she at first *83 stated that she did not know anything about the phone, she then stated that Colbert had given her the phone, but it was shut off shortly after the shooting. When asked why the phone bill showed five calls to Colbert from that phone on the day preceding the shooting, Ms. Alexander insisted that these calls were incoming calls, not outgoing calls. Ms. Alexander admitted that since the storm, her daughter has been living with Colbert's mother in order to continue her schooling. She denied writing any letters to Colbert since the shooting. She also denied being with Colbert two nights before the shooting.
With respect to the events leading up to the shooting, Ms. Alexander testified that she stayed the night before the shooting with her female friend because she had seen Colbert hiding in the bushes when they came home. She reiterated the testimony she gave on direct examination concerning the shooting. She stated that although the lighting in the parking lot was not too good, she knew Colbert and easily recognized him. She testified that when Colbert was trying to force her into her car, and she told him that their daughter was inside the apartment with her friend, Colbert responded that he would have to kill her, too. She stated that no one else was in the parking lot at the time of the shooting.
On redirect, Ms. Alexander testified that she made phone calls to Colbert on the cell phone to warn him not to contact her anymore. She testified that she did not hear any other gunshots in the area that night. She testified that she never prevented Colbert from seeing their daughter prior to the shooting. She stated that she and Colbert were together for three to four years, but they broke up for good in January 2003. She testified that she started dating Wilbert after she learned that Colbert was dating other women, but she insisted Colbert always acted as if they were still dating. She testified that the incident wherein Colbert accused her of stealing the rims from his car, as well as an argument they had while she was washing her car, occurred before she made the tape of their conversation.
Off. Jay Jaquet of the NOPD Latent Print Unit testified that he examined the fingerprints lifted from Colbert's car. He testified that four prints matched those of Colbert, eight matched a person named Tiki Moses, and none of them matched prints taken from Jefferson in the morgue.
The State introduced true copies of two "stay away" orders issued to Colbert, one filed in April 2003 and signed by Colbert in May 2003, and another filed and signed by Colbert in June 2002.

DISCUSSION

Errors Patent
A review of the record for reveals no patent errors.

Assignments of Error

I
The appellant raises four assignments of error on appeal. We initially consider his second assignment of error as it raises an issue of sufficiency of the evidence.[1] In his second assignment of error, the appellant argues that the trial court erred by denying his motions for post verdict judgment of acquittal, for new trial, and for arrest of judgment. With respect to the motion for post verdict judgment of *84 acquittal, he sets forth no specific argument, but instead merely alleges that the evidence adduced at trial was insufficient to support his manslaughter and attempted second degree kidnapping convictions. However, after reviewing the record, we find the evidence was sufficient to support both convictions.
The Louisiana Supreme Court set forth the standard for evaluating a claim of insufficient evidence in State v. Brown, XXXX-XXXX, p. 22 (La.4/12/05), 907 So.2d 1, 18:
When reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts are controlled by the standard enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this standard, the appellate court "must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." State v. Neal, 00-0674, (La.6/29/01)[,] 796 So.2d 649, 657 (citing State v. Captville, 448 So.2d 676, 678 (La.1984)).
When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 requires that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." Neal, 796 So.2d at 657. Ultimately, all evidence, both direct and circumstantial must be sufficient under Jackson to prove guilt beyond a reasonable doubt to a rational jury. Id. (citing State v. Rosiere, 488 So.2d 965, 968 (La.1986)).
See also State v. Batiste, XXXX-XXXX (La. App. 4 Cir. 12/20/06), 947 So.2d 810; State v. Sykes, XXXX-XXXX (La.App. 4 Cir. 3/9/05), 900 So.2d 156.
Here, the appellant was charged with the second degree murder of Jonathan Jefferson but convicted of the responsive verdict of manslaughter. Second degree murder is defined in pertinent part as "the killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm." La. R.S. 14:30.1. La. R.S. 14:10(1) defines specific criminal intent as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or his failure to act." Specific intent may be inferred from the circumstances and actions of the defendant. State v. Brown; State v. Williams, XXXX-XXXX (La.App. 4 Cir. 1/18/06), 925 So.2d 567[2]; State v. Hebert, XXXX-XXXX (La.App. 4 Cir. 4/11/01), 787 So.2d 1041. Specific intent can be formed in an instant. State v. Cousan, 94-2503 (La.11/25/96), 684 So.2d 382; Williams. By contrast, R.S. 14:31 defines manslaughter in part as:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed.
As the State notes, evidence sufficient to support the charged offense will be deemed to be sufficient to support the responsive verdict where the defendant *85 does not object to the inclusion of the responsive verdict. See State v. Harris, XXXX-XXXX (La.5/20/03), 846 So.2d 709; State ex rel. Elaire v. Blackburn, 424 So.2d 246 (La.1982).
Here, Ms. Alexander testified that the appellant approached her and Jefferson as they exited her car after returning to the parking lot of her apartment complex. She testified that the appellant shot Jefferson several times while Jefferson was attempting to get into his car, where she had taken refuge. Although the defense tried to show that Ms. Alexander fabricated this testimony and that the appellant ran from the police because someone had been shooting at him a few blocks from the scene, the jury chose to believe Ms. Alexander's testimony that she saw the appellant repeatedly shoot Jefferson. This court has repeatedly held that a factfinder's credibility decision should not be disturbed unless it is clearly contrary to the evidence. State v. Huckabay, XXXX-XXXX (La.App. 4 Cir. 2/6/02), 809 So.2d 1093; State v. Harris, 99-3147 (La.App. 4 Cir. 5/31/00), 765 So.2d 432. Nothing in the record before us indicates that the jury's credibility finding is clearly contrary to the evidence.
Likewise, the appellant alleges that the evidence was insufficient to support his conviction for the attempted second degree kidnapping of Ms. Alexander. La. R.S. 14:44.1 A(5) defines second degree kidnapping in pertinent part as: "the doing of any of the acts listed in Subsection B wherein the victim is: ... (5) Imprisoned or kidnapped when the offender is armed with a dangerous weapon ... B. For purposes of this Section, kidnapping is: (1) The forcible seizing and carrying of any person from one place to another." In addition, La. R.S. 14:27 defines an attempt as occurring when "[a]ny person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object." Ms. Alexander testified that after the appellant shot Jefferson, he came around to her side of the car, ordered her out at gunpoint, threatened to kill her, and took her over to her car, where he tried to get her to enter the back seat. This unrefuted testimony established the elements of attempted second degree kidnapping. Thus, the trial court did not err by denying the motion for a post verdict judgment of acquittal.
With respect to the motion for new trial, the motion alleged that the evidence was not sufficient to support the verdict (La.C.Cr.P. art. 851(1)) and that a new trial should have been granted to satisfy the ends of justice (La.C.Cr.P. art. 851(5)). As to the first ground, the denial of a motion for new trial based upon La. C.Cr.P. art. 851(1) is not subject to review. See State v. Toups, XXXX-XXXX (La.App. 4 Cir. 10/8/03), 859 So.2d 768; State v. Huckabay, XXXX-XXXX (La.App. 4 Cir. 2/6/02), 809 So.2d 1093. This holding is based upon the reasoning that review of a ruling on a motion for new trial is limited to a review of "error of law," see La.C.Cr.P. art. 858, and that a trial judge's ruling on a motion for new trial on the basis that the verdict is contrary to the law and evidence is grounded on the court's reassessment of the weight of the evidence, not the actual sufficiency of the evidence, which would bar a new trial. See State v. Mack, 37,174 (La.App. 2 Cir. 6/27/03), 850 So.2d 1035. Thus, this court cannot consider the trial court's ruling on the motion for new trial on this basis. Likewise, the Court has held that a trial court's ruling on a motion for new trial based upon La.C.Cr.P. art. 851(5) presents nothing for review. See State v. Toomer, 395 So.2d 1320 (La.1981); State v. Haywood, 2004-2097 (La.App. 4 *86 Cir. 6/15/05), 907 So.2d 168[3]. Therefore, this court cannot review the trial court's denial of the motion for new trial based upon either subsection (1) or subsection (5) of La.C.Cr.P. art. 851.
Regarding the motion in arrest of judgment, the appellant alleged that the verdict must be vacated because the State did not timely institute prosecution of the offenses, tracking the language of La. C.Cr.P. art. 859(7), and therefore the delay deprived him of the benefit of useful and exculpatory evidence. However, as per La.C.Cr.P. art. 572 A(1), the State had six years to institute prosecution of the attempted kidnapping charge, and as per La.C.Cr.P. art. 571, the State had no limitation for instituting prosecution of the second degree murder charge. The crimes occurred on October 13, 2003, and the jury returned its indictment on December 11, 2003, less than two months after the crimes occurred. Thus, there was no basis for the court to grant relief on this ground. In its brief, the State addressed the issue of whether the State complied with the time limitations of La.C.Cr.P. art. 578 for commencing trial. However, this is not a ground upon which a motion in arrest of judgment may be granted. In State v. Ijaz, 427 So.2d 848 (La.1983), the Court held that grounds listed in La. C.Cr.P. art. 859 are exclusive, and thus, a court cannot entertain any other grounds when considering a motion in arrest of judgment. Therefore, the trial court did not err by denying the motion in arrest of judgment. The appellant's claims as to the denial of his motions for post verdict judgment of acquittal, a new trial, and in arrest of judgment have no merit.

II.
By his first assignment of error, the appellant contends that the trial court erred by allowing the State to introduce evidence of other bad acts purportedly perpetrated by him against Ms. Alexander. He argues that there was no valid purpose for the introduction of this evidence, and its prejudicial effect far outweighed its probative value.
The State sought to introduce this evidence under La. C.E. art. 404(B)(1), which provides:
Except as provided in Article 412 [not applicable here], evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to the conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
As per State v. Miller, 98-0301 (La.9/9/98), 718 So.2d 960, the factor listed in art. 404 B(1) which the State intends to prove through the use of other crimes evidence must either be an element of the crime charged, be at issue in the case, or have some independent relevance to the case. The State must prove by clear and convincing evidence that the defendant committed the other crime. Even if the evidence is relevant, the trial court may exclude it if its probative value is substantially outweighed by prejudicial effect, or if it would confuse the jury or waste the *87 court's time. See La. C.E. art. 403. In addition, the State must meet the requirements set forth in State v. Prieur, 277 So.2d 126 (La.1973) with respect to pretrial written notice of its intent to use this evidence and a detailed description of the prior bad acts. State v. Gibson, 99-2827 (La.App. 4 Cir. 4/11/01), 785 So.2d 213. The Supreme Court urged caution in the use of art. 404(B) in State v. Kennedy, XXXX-XXXX, p. 5 (La.4/3/01), 803 So.2d 916, 920:
Simply put, the rule articulated in Article 404(B)(1) prohibits the State from introducing evidence of other crimes, wrongs, or acts to show a probability that the accused committed the charged crime because he is a "bad" person who has a propensity for this type of offense. This court has long recognized that evidence of previous criminal activity does affect, reasonably or not, the opinions of the jurors sitting in judgment. See State v. Moore, 278 So.2d 781, 787 (La. 1972) (on rehearing). Therefore, the admissibility of other unrelated misconduct "involves substantial risk of grave prejudice to a defendant." State v. Prieur, 277 So.2d 126, 128 (La.1973) (citing 1 Wigmore, Evidence, § 194 (3rd ed.)).
In State v. Rose, XXXX-XXXX, p. 13 (La.2/22/07), 949 So.2d 1236, 1243-1244, the Court discussed the balancing test of undue prejudice and probative value:
Although a defendant's prior bad acts may be relevant and otherwise admissible under La. C.E. art. 404(B), the court must still balance the probative value of the evidence against its prejudicial effects before the evidence can be admitted. La. C.E. art. 403. Any inculpatory evidence is "prejudicial" to a defendant, especially when it is "probative" to a high degree. State v. Germain, 433 So.2d 110, 118 (La.1983). As used in the balancing test, "prejudicial" limits the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial. Id. See also Old Chief v. United States, 519 U.S. 172, 180, 117 S.Ct. 644, 650, 136 L.Ed.2d 574 (1997)("The term `unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged.").
In Rose, the defendant was convicted of the strangulation murder of his second wife. At trial, the State introduced evidence of the defendant's manslaughter conviction in the stabbing death of his first wife, of his conviction of violent acts against the first wife before her death when they were estranged, and of violent acts committed against the second wife (the victim in the case) while they were separated. Although this court reversed the defendant's conviction, finding that the acts against the first wife were not similar enough to be admissible in the second degree murder trial involving his second wife, State v. Rose, XXXX-XXXX (La.App. 4 Cir. 1/18/06), 925 So.2d 34, the Supreme Court reversed, finding that this evidence was admissible both to show identity (there were no independent witnesses to the murder) and motive. With respect to the use of other crimes evidence to prove motive, the Court stated: "For evidence of motive to be independently relevant, it must be factually peculiar to the victim and the charged crime. State v. Lafleur, 398 So.2d 1074, 1080 (La.1981)." State v. Rose, XXXX-XXXX at p. 15, 949 So.2d at 1244. The Court also quoted from State v. Welch, 615 So.2d 300, 303 (La.1993): "[T]he state could not place the circumstances of the offense in their proper context without reference to the nature of the relationship existing between the victim and the defendant.... The primary purpose of the evidence [of prior acts of violence *88 or threats of violence] was not to prove Welch's bad character but to illustrate the volatile nature of his relationship with the victim...." State v. Rose, XXXX-XXXX at p. 15, 949 So.2d at 1245.
Here, the State sought to introduce several incidents that occurred before the shooting and attempted kidnapping in 2003. The court disallowed all that occurred prior to the summer of 2003 that did not result in a police report, but it allowed the State to present evidence as to incidents that resulted in police action as well as incidents from the summer of 2003 where the police were not called. Ms. Alexander testified as to most of these incidents.[4] The appellant does not now claim that the State failed to comply with the notification requirements for the introduction of this testimony, nor does he allege that the State did not prove he was the perpetrator of these incidents. Indeed, the State amended its Prieur notice in December 2004 to reflect exactly what evidence it sought to introduce, and Ms. Alexander's lengthy testimony at two pretrial hearings showed by clear and convincing evidence that the appellant engaged in the alleged incidents. Instead, the appellant argues that the prejudicial effect of this evidence far outweighed its probative value. He questions whether the evidence was admissible to prove either intent or motive, because he insists that the State did not have to show a motive for the murder and did not need to show his intent. He finally argues that because these events occurred in connection with Ms. Alexander, rather than in connection with Jefferson, they were not admissible in the trial of Jefferson's murder.
Contrary to the appellant's assertions, the State had to prove the appellant's intent to kill or inflict great bodily harm on Jefferson in order to prove he committed a second degree murder. Likewise, although the State did not have to show a motive for the killing, it was not precluded from presenting evidence to show why the appellant shot and killed Jefferson, whom he apparently did not know. It is true that the prior bad acts by the appellant all involved Ms. Alexander and did not pertain to Jefferson. However, they were all part of a pattern of the appellant's obsession with Ms. Alexander. The evidence of his prior bad acts showed his continuing intent to keep her from leaving him and from seeing other men; in most of these incidents, the appellant threatened to harm both Ms. Alexander and any man with whom he caught her. Jefferson's murder and Ms. Alexander's attempted kidnapping were the last incidents in the appellant's escalating attacks on Ms. Alexander. As such, evidence of the prior incidents was relevant to show the appellant's intent to murder Jefferson as well as his motive for doing so. The probative value of evidence of these prior offenses far outweighs its prejudicial effect. Thus, the trial court did not err by allowing the introduction of this evidence.
The appellant also argues that because some of these incidents resulted in municipal convictions, they were inadmissible at trial. In support, he cites State v. Wilcoxon, 26,126 (La.App. 2 Cir. 6/22/94), 639 So.2d 385, and State v. Johnson, 446 So.2d 1371 (La.App. 1 Cir.1984). However, these cases held that convictions for municipal crimes cannot be used for impeachment *89 purposes. The prior bad acts in this case were not used for impeachment purposes, but rather to show intent and motive as per La.C.Cr.P. art. 404, which allows evidence of not only convictions but also unadjudicated acts committed by the defendant. Further, in State v. Tolbert, XXXX-XXXX (La.6/27/03), 849 So.2d 32, the Court overruled its prior jurisprudence and found that convictions for municipal offenses could be used for impeachment purposes.
The State gave adequate pretrial notice of the incidents it sought to introduce at trial, and it proved by clear and convincing evidence through Ms. Alexander's pretrial testimony that the appellant committed these acts. The testimony was properly introduced to show intent and motive, and its probative value outweighed its prejudicial effect. Therefore, the trial court did not err by allowing the introduction of this evidence. This assignment of error has no merit.

III.
By his next assignment of error, the appellant argues that the trial court erred by denying his request to remove a juror during trial. During the second day of trial, after crime lab witnesses had testified, the court sent the jury to the jury room but asked one juror, Ms Angelico, to remain. Once the other jurors had gone, the court stated that Ms. Angelico had indicated that her work for LSU hospitals brought her into contact with bullets that were turned over to the police. Ms. Angelico then testified that although she worked for the LSU system, her office was in Charity Hospital in New Orleans. She testified that her job brought her into contact with coroner's offices and police from all over the state, and she had in the past turned over ballistic evidence to NOPD. She testified that generally other personnel handled this task, but she stated that if police officers arrived to retrieve material discovered in the operating room and hospital police officers were not available to escort the officers upstairs to retrieve the evidence, she would do so, and her signature would be on the chain of custody forms. She testified that although she was working in this capacity on October 13, 2003, the date of the shooting, she had nothing to do with this case; if she did, her name would have appeared in the documentation. She insisted that she did not know anything about the shooting or know the witnesses who testified. She indicated that she would not have been involved in the transfer of any evidence taken in the emergency room; the evidence she saw being transferred was taken from the operating room. When asked if her employment would "make any difference to you," she replied that it would not because it was just a part of her job.
After reiterating that Ms. Angelico was not involved in the transfer of evidence from the emergency room, the court noted that the victim died before getting to the hospital, and thus there was no operation performed on him. After Ms. Angelico left chambers, defense counsel moved to have her removed and replaced by the alternate juror, noting that Ms. Angelico apparently felt strongly enough about the matter to bring it to the court's attention. Defense counsel also theorized that Ms. Angelico could have been involved in the chain of custody in this case. The prosecutor replied that nothing indicated that she was involved in the case. The court then stated:
Again, I listened to Ms. Angelico, and she has said that the only interface, as she put it, that she would have is when police officers would come to recover something when the patient was in the operating room and/or recovery room. The victim never made it to either one of *90 those places. He was at most confined to the ER room at the Medical Center. Ms. Angelico further in this Court's ultimate discretion finds that even not withstanding the outside chance that she may have been in some way in contact with this case, it would not influence her in any way or change her opinion about her ability to be a fair and impartial juror. The Court finds that Ms. Angelico can still remain a juror in this case. And that virtue of her employment does not in and or itself disqualify her absent any other showing.
The defense objected, and the jury then returned to court. The appellant now argues that the State failed to show that Ms. Angelico could be a fair and impartial juror.
La.C.Cr.P. art. 789 provides for the removal of jurors and replacement with alternate jurors when the original jurors "become unable to perform or [are] disqualified from performing their duties." When there is an allegation that a juror must be replaced, the trial court must hold an evidentiary hearing with all parties to determine if the juror needs to be removed. State v. Fuller, 454 So.2d 119 (La.1984). A trial court has great discretion in ruling on the qualifications for a juror to serve, and its ruling should not be disturbed unless the reviewing court finds a clear abuse of this discretion. State v. Jones, 315 So.2d 650 (La.1975).
Removal and replacement of a juror is warranted when the juror is found not to be impartial. For example, in State v. Sepcich, 473 So.2d 380 (La.App. 5 Cir. 1985), the juror discovered during trial that she knew some of the witnesses because she shopped in the store where the crime occurred. She notified the court, and during a hearing, she said she could not be impartial or fair due to this knowledge. The court removed her and replaced her with an alternate juror. The appellate court affirmed the trial court's ruling. Likewise, in State v. Maillian, 464 So.2d 1071 (La.App. 1 Cir.1985), the juror noticed a woman whom she knew sitting behind the victim's mother. She indicated that if the woman, whom she greatly admired, had some connection to the victim, she could not be impartial to the defense. When she learned that the woman was married to the victim's uncle, she declared that she could not be impartial. The trial court replaced her with a alternate juror, and the appellate court upheld the trial court's action.
In two cases this court upheld the trial court's replacement of an original juror with an alternate. In State v. Derouselle, 97-2590 (La.App. 4 Cir. 8/30/00), 769 So.2d 141, on remand from the Supreme Court, this court found that the trial court properly replaced a juror who had answered during voir dire that none of her family or close friends had been convicted of a crime, but during the trial she broke down when she learned that her fiancé's federal parole had been revoked. Although the juror indicated at a hearing that she would not hold this fact against the State, the trial court still replaced her. In State v. Williams, 460 So.2d 2 (La.App. 4 Cir. 1984), the court replaced a sitting juror when the State learned that she had indicated in other trials that she could not be fair to the State. During an in camera hearing, the juror indicated that she could not be fair because she had a brother serving time in Angola.
By contrast, courts have found that replacement was not necessary when there was no showing that the juror could not be fair or impartial. In State v. Packnett, 04-709 (La.App. 5 Cir. 12/28/04), 892 So.2d 615, a juror told the bailiff that they should all pack up and leave because "we" had heard enough. When questioned by the *91 court, the juror indicated that he had not discussed the case with the other jurors and had not made up his mind as to the defendant's guilt. The trial court refused to replace him with an alternate juror, and the court's decision was upheld on appeal. In State v. Gabriel, 542 So.2d 528 (La.App. 5 Cir.1989), the juror realized he knew the victim when the victim got up to testify. Defense counsel requested a mistrial, but the State suggested that the juror be replaced. Defense counsel then maintained that the court was not authorized to do so and insisted on the mistrial. The court denied the motion for mistrial and did not replace the juror. The appellate court affirmed the defendant's resulting conviction, noting that the juror's statements did not show a basis to replace her merely because she realized that she knew the victim. In State v. Ducksworth, 496 So.2d 624 (La.App. 1 Cir.1986), the defense alleged both during voir dire and again during trial that the juror knew the murder victim's family. The court conducted a hearing during trial wherein the juror insisted that she did not know the family. The court then refused to replace the juror. The appellate court rejected the defendant's assignment of error alleging that the trial court erred. The court noted that the record showed no cause to replace the juror.
Here, the juror indicated that her work occasionally brought her in contact with police officers who retrieved ballistics evidence from the hospital where she worked. However, she knew nothing about the present case, and because she was not involved with any evidence retrieved from the emergency room, where the victim had been taken, she would have had no contact with the evidence in this case. She indicated that the fact that she came in contact with officers would not make any difference to her with respect to this case. Given this testimony, there would have been no basis for the trial court to find that she was partial or could not be fair. Thus, the trial court properly denied the request to remove her and replace her with an alternate juror. This assignment has no merit.

IV.
By his final assignment of error, the appellant contends that the trial court imposed excessive sentences in this case. The trial court imposed a forty-year sentence for the manslaughter conviction and a twenty-year sentence for the attempted second degree kidnapping conviction, the maximum sentences for both counts. See La. R.S. 14:31; 14:27/44.1. Although the appellant's motion to reconsider sentence was not timely filed[5], after the court imposed the sentences, counsel moved to appeal the appellant's sentences. Thus, his sentencing claim was preserved for appeal.
In State v. Smith, 2001-2574, p. 7 (La.1/14/03), 839 So.2d 1, 4, the Court set forth the standard for evaluating a claim of excessive sentence:
Louisiana Constitution of 1974, art. I, § 20 provides, in pertinent part, that "[n]o law shall subject any person to ... excessive ... punishment." (Emphasis added.) Although a sentence is within statutory limits, it can be reviewed for constitutional excessiveness. State v. Sepulvado, 367 So.2d 762, 767 (La.1979). A sentence is unconstitutionally excessive when it imposes punishment grossly disproportionate to the severity of the offense or constitutes nothing more than *92 needless infliction of pain and suffering. State v. Bonanno, 384 So.2d 355, 357 (La.1980). A trial judge has broad discretion when imposing a sentence and a reviewing court may not set a sentence aside absent a manifest abuse of discretion. State v. Cann, 471 So.2d 701, 703 (La.1985). On appellate review of a sentence, the relevant question is not whether another sentence might have been more appropriate but whether the trial court abused its broad sentencing discretion. State v. Walker, 00-3200, p. 2 (La.10/12/01), 799 So.2d 461, 462; cf. State v. Phillips, 02-0737, p. 1 (La.11/15/02), 831 So.2d 905, 906.
See also State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672; State v. Batiste, XXXX-XXXX (La.App. 4 Cir. 12/20/06), 947 So.2d 810; State v. Landry, XXXX-XXXX (La.App. 4 Cir. 3/31/04), 871 So.2d 1235.
In Batiste, at p. 18, 947 So.2d at 820, this court further explained:
An appellate court reviewing a claim of excessive sentence must determine whether the trial court adequately complied with the statutory guidelines in La.C.Cr.P. art. 894.1, as well as whether the facts of the case warrant the sentence imposed. State v. Landry, supra; State v. Trepagnier, 97-2427 (La.App. 4 Cir. 9/15/99), 744 So.2d 181. However, as noted in State v. Major, 96-1214, p. 10 (La.App. 4 Cir. 3/4/98), 708 So.2d 813:
The articulation of the factual basis for a sentence is the goal of Art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, resentencing is unnecessary even when there has not been full compliance with Art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982). The reviewing court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. La.C.Cr.P. art. 881.4(D).
If the reviewing court finds adequate compliance with art. 894.1, it must then determine whether the sentence the trial court imposed is too severe in light of the particular defendant as well as the circumstances of the case, "keeping in mind that maximum sentences should be reserved for the most egregious violators of the offense so charged." State v. Landry, XXXX-XXXX at p. 8, 871 So.2d at 1239. See also State v. Bonicard, 98-0665 (La.App. 4 Cir. 8/4/99), 752 So.2d 184.
Here, the court more than adequately complied with La.C.Cr.P. art. 894.1. The court stated that it had reviewed the presentence investigation report, in which the appellant noted that he "made a serious error in judgment that resulted in the death of another person," but he had been obsessed with Ms. Alexander. The court stated that although the jury found the appellant guilty of manslaughter, he had been charged with second degree murder. The court then detailed the appellant's criminal record, which included juvenile adjudications since 1994 and adult arrests and convictions since 2000. He had arrests for disturbing the peace, simple criminal damage to property, criminal trespass, lewd conduct, domestic violence, intimidation, disturbing the peace, and possession of burglary tools. He pled guilty to theft in 2001 and received a suspended sentence. With respect to the present offenses, the court noted that the murder victim was "in the wrong place at the wrong time, with the wrong person." The court then applied the factors of La. C.Cr.P. art. 894.1 to this case, both aggravating and mitigating, noting that the victim was not armed, did not initiate nor participate in the incident that led to the shooting, but

*93 was merely, in this Court's estimation, an innocent bystander to an awful relationship that should have ended a long time before the night that Mr. Jefferson wandered into Ms. Alexander's life. And unfortunately for him and for his family that sits here today in court, as they always sat here, they have to live with the results forever of your relationship and your actions with the victim in this case. And whether one side is more right or one side is more wrong, the end result is the same, that one person is dead needlessly, violently, and without any remorse.
(5/11/07 sent. tr. p. 8) The court then sentenced the appellant to serve forty years at hard labor for the manslaughter conviction and twenty years at hard labor without benefit of parole, probation, or suspension of sentence for the attempted second degree kidnapping sentence, the sentences to run concurrently.
The appellant nonetheless argues that the imposition of maximum sentences on both counts was an abuse of the trial court's sentencing discretion. In support, he cites State v. Soraparu, 96-0116 (La. App. 4 Cir. 2/5/97), 688 So.2d 1320, where this court found that the trial court had twice abused its discretion by imposing the maximum sentence on a defendant who, like the appellant, was charged with second degree murder but was convicted of manslaughter. However, the Supreme Court reversed this portion of this court's opinion and reinstated the trial court's sentence. In a one-paragraph per curiam, the Court stated:
On appellate review of sentence, the only relevant question is "`whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate.'" State v. Cook, 95-2784, p. 3 (La.5/31/96), 674 So.2d 957, 959 (quoting State v. Humphrey, 445 So.2d 1155, 1165 (La. 1984)), cert. denied, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996). For legal sentences imposed within the range provided by the legislature, a trial court abuses its discretion only when it contravenes the prohibition of excessive punishment in La. Const. art. I, § 20, i.e., when it imposes "punishment disproportionate to the offense." State v. Sepulvado, 367 So.2d 762, 767 (La.1979). In cases in which the trial court has left a less than fully articulated record indicating that it has considered not only aggravating circumstances but also factors militating for a less severe sentence, State v. Franks, 373 So.2d 1307, 1308 (La.1979), a remand for resentencing is appropriate only when "there appear[s] to be a substantial possibility that the defendant's complaints of an excessive sentence ha[ve] merit." State v. Wimberly, 414 So.2d 666, 672 (La. 1982). The trial court's finding in this case that the defendant committed a "cold and deliberate act" which would have fully justified the return of a verdict of second degree murder adequately supports the sentence imposed.
State v. Soraparu, 97-1027 (La.10/13/97), 703 So.2d 608.
Likewise, although the appellant here was convicted of manslaughter, the State originally charged him with second degree murder. Indeed, the fact that the appellant was lying in wait with a gun when Ms. Alexander and Jefferson arrived on the scene shows that his actions were not exactly spontaneous reactions to seeing Ms. Alexander and Jefferson together. In addition, this court has upheld forty-year sentences for manslaughter in the past. See State v. Allen, XXXX-XXXX (La.App. 4 *94 Cir. 3/7/07), 954 So.2d 779[6] (the defendant, who had prior convictions, stabbed someone whom he thought had stolen his wallet); State v. Bell, 2002-2349 (La.App. 4 Cir. 8/6/03), 854 So.2d 429 (the defendant, who had no prior convictions, stabbed her lover; she had been charged with second degree murder); State v. Jones, XXXX-XXXX (La.App. 4 Cir. 3/20/02), 814 So.2d 623 (the defendant, charged with second degree murder, was convicted of manslaughter in the shooting death of a man with whom he had fought earlier the same night); State v. Williams, 99-2355 (La.App. 4 Cir. 12/13/00), 776 So.2d 604 (the defendant, charged with first degree murder, was convicted of manslaughter when he opened fire in the apartment of a man with whom he had previously fought). Given the circumstances of this case, we cannot say that the trial court abused its discretion by imposing the maximum sentence for manslaughter.
Moreover, we do not find that the trial court abused its discretion by imposing the maximum sentence for the attempted second degree kidnapping count. Although we found no reported Louisiana cases reviewing sentences for attempted second degree kidnapping[7], in State v. Woodberry, 95-2402 (La.App. 4 Cir. 12/27/96), 686 So.2d 984, this court upheld a thirty-five-year sentence for the completed crime of second degree kidnapping where the defendant grabbed the victim at gunpoint, carried her off in his car, sexually assaulted her, and then robbed her. Other courts have upheld maximum sentences for the completed crime of second degree kidnapping where the kidnapping occurred in connection with other crimes. See State v. Office, 2007-193 (La.App. 3 Cir. 10/3/07), 967 So.2d 1185 (the defendant shot at the victim as the victim tried to escape; he was convicted of second degree kidnapping and armed robbery) State v. Moore, 37,935 (La.App. 2 Cir. 1/28/04), 865 So.2d 227 (the defendant was convicted of armed robbery, second degree kidnapping, and attempted second degree murder, where he shot the victim and left the victim for dead; his consecutive maximum sentences on all counts were affirmed); State v. Brock, 37,487 (La.App. 2 Cir. 9/26/03), 855 So.2d 939 (the defendant, convicted of aggravated burglary and second degree kidnapping, entered the victim's home, robbed her, forced her to go with him, then left her for dead; his concurrent maximum sentences on all counts were affirmed); State v. Lefevre, 02-592 (La.App. 5 Cir. 10/29/02), 831 So.2d 398[8] (kidnappings occurring during a robbery of a store; the defendant was convicted of armed robbery, second degree kidnapping, and aggravated burglary; the court upheld the maximum sentences on each count but amended the sentences to run concurrently rather than consecutively).
Here, as in the cases cited above, the kidnapping occurred during an incident involving other crimes. Although Ms. Alexander, the victim of the attempted second degree kidnapping, was not the victim of the manslaughter, the appellant shot Jefferson because he was with Ms. Alexander. In addition, the kidnapping was an escalation of the appellant's prior offenses against Ms. Alexander. Given these factors, we find no error in the trial court's imposition of the maximum sentence for *95 the attempted second degree kidnapping of Ms. Alexander. This assignment of error has no merit.

CONCLUSION
Accordingly, the appellant's convictions and sentences are affirmed.
AFFIRMED.
NOTES
[1] When sufficiency is raised as an assignment of error, a reviewing court must determine whether there was sufficient evidence before addressing any other assignments of error. See State v. Marcantel, XXXX-XXXX (La.4/3/02), 815 So.2d 50; State v. Hearold, 603 So.2d 731 (La. 1992).
[2] Writ den. XXXX-XXXX (La. 11/3/06), 940 So.2d 658.
[3] Writ den. State ex rel. Haywood v. State, XXXX-XXXX (La. 10/27/06), 939 So.2d 1277.
[4] Prior to trial, the court granted the State's Prieur motion as to a May 2002 incident that arose when the appellant hit Ms. Alexander in the mouth outside her apartment, a May 2003 incident wherein he yelled at her and hit the glass of her car window when she was dropping off a friend, and a September 2003 incident wherein he hit her when she went to pick up their child. At trial, Ms. Alexander did not testify as to these incidents.
[5] The appellant was convicted on March 7, 2007, and sentenced on May 11, 2007. His motion to reconsider sentence was not filed until July 16, 2007, after new counsel enrolled. As per La.C.Cr.P. art. 881.1, a defendant has only thirty days in which to file his motion to reconsider sentence.
[6] Writ den. XXXX-XXXX (La. 11/9/07), 967 So.2d 502.
[7] In State v. Durand, unpub. 99-1116 (La. App. 4 Cir. 1/12/00), 761 So.2d 820, this court upheld a forty-year sentence for a defendant convicted of attempted second degree kidnapping and sentenced as a multiple offender.
[8] Writ granted in part on other grounds, 2002-2924 (La.10/3/03), 855 So.2d 291.