STATE OF LOUISIANA
COURT OF APPEAL
FIRST CIRCUIT

DOCKET NUMBER
2023 KA 0781

STATE OF LOUISIANA

VERSUS

TYLER J. JACKSON

Judgment Rendered: **FEB 2 3 2024**

* * * * *

ON APPEAL FROM THE
EIGHTEENTH JUDICIAL DISTRICT COURT, DIVISION C
IN AND FOR THE PARISH OF IBERVILLE
STATE OF LOUISIANA
DOCKET NUMBER 629-18

HONORABLE ALVIN BATISTE, JR., JUDGE PRESIDING

* * * * *

Prentice L. White
Baton Rouge, Louisiana

Attorney for Defendant-Appellant
Tyler J. Jackson


Antonio M. "Tony" Clayton
District Attorney
Terri Russo Lacy
Assistant District Attorney
Port Allen, Louisiana

Attorneys for Plaintiff-Appellee
State of Louisiana


BEFORE:   THERIOT, PENZATO, AND GREENE, JJ.

**GREENE, J.**

A grand jury indicted the defendant, Tyler Jackson, with one count of second degree murder, a violation of La. R.S. 14:30.1. He pled not guilty and, following a jury trial, the jury found him guilty as charged. The trial court denied the defendant's motion for new trial and sentenced him to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. The defendant now appeals, challenging the sufficiency of the evidence and the trial court's failure to remove a juror. For the following reasons, we affirm the conviction and sentence.

## FACTS

On the evening of April 7, 2018, the victim, Thailan Cutno, attended a party at the White Castle Community Center (WCCC) with his friends Christian Harding and Henry Broden, III. While the group was in the gymnasium, an individual ran up and hit Mr. Cutno on the head with a gun and then shot him in the chest and back, killing him.

A few hours after the shooting, detectives with the Iberville Parish Sheriff's Office (IPSO) interviewed Mr. Harding and Mr. Broden, who provided a description of the perpetrator. Upon receiving information that the defendant was responsible for the shooting, detectives generated a photographic lineup containing the defendant's photograph, which they presented to Mr. Broden. Mr. Broden positively identified the defendant as the shooter, and officers ultimately arrested and charged the defendant with Mr. Cutno's murder.

## SUFFICIENCY OF THE EVIDENCE

In his first assignment of error, the defendant argues the evidence presented at trial was insufficient to support his conviction for second degree murder.

A conviction based on insufficient evidence cannot stand, as it violates due process. *See* U.S. Const. amend. XIV, La. Const. art. I, §2. In reviewing claims challenging the sufficiency of the evidence, an appellate court must determine whether any rational trier of fact could have found the essential elements of the crime and the defendant's identity proven beyond a reasonable doubt based on the entirety of the evidence, when viewed in the light most favorable to the prosecution. *See* La. C.Cr.P. art. 821(B); *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *State v. Southall*, 2022-

2

0746 (La. App. 1 Cir. 6/2/23), 369 So.3d 925, 930. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the factfinder must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence. *Southall*, 369 So.3d at 930.

The due process standard does not require the reviewing court to determine whether it believes the witnesses or whether it believes the evidence establishes guilt beyond a reasonable doubt. *State v. Mire*, 2014-2295 (La. 1/27/16), 269 So.3d 698, 703 (*per curiam*). Rather, appellate review is limited to determining whether the facts established by the direct evidence, and inferred from the circumstances established by that evidence, are sufficient for any rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. *State v. Livous*, 2018-0016 (La. App. 1 Cir. 9/24/18), 259 So.3d 1036, 1040, *writ denied*, 2018-1788 (La. 4/15/19), 267 So.3d 1130. The weight given evidence is not subject to appellate review; therefore, an appellate court will not reweigh evidence to overturn a factfinder's determination of guilt. *Id.*

Second degree murder is pertinently defined as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1). Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). The State bears the burden of proving these statutory elements, as well as the burden of proving the identity of the defendant as the perpetrator. *State v. Draughn*, 2005-1825 (La. 1/17/07), 950 So.2d 583, 593, *cert. denied*, 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007). When the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification. *State v. Weary*, 2003-3067 (La. 4/24/06), 931 So.2d 297, 311, *cert. denied*, 549 U.S. 1062, 127 S.Ct. 682, 166 L.Ed.2d 531 (2006). A positive identification by only one witness is sufficient to support a conviction. *Id.* In this case, the defendant only challenges the evidence insofar it relates to his identity as the perpetrator, not the elements of the offense.

Mr. Harding testified that he arrived at the party with Mr. Cutno and Mr. Broden at around 10 or 11 p.m. Upon entering the gymnasium, they headed towards the middle of the floor. A video from Mr. Harding's cell phone was introduced into evidence; the video

3

depicted Mr. Broden and Mr. Cutno in the foreground, as well as the lighting conditions in the gymnasium. After approximately 10 to 15 minutes, they entered the lobby, where Mr. Cutno spoke with his cousin, Tremecia Porter. Mr. Harding testified that, after the group went back into the gymnasium about 10 minutes later, an individual ran up and hit Mr. Cutno on the head with a gun twice. Mr. Harding and Mr. Broden punched the attacker, who then aimed the gun at them, then directly at Mr. Cutno, and fired two shots. Mr. Harding testified that, although part of the gymnasium was dark, the area where Mr. Cutno was shot was near a door where light was coming in, which allowed him to see the shooter's face.[1] Mr. Harding admitted that when interviewed by officers after the shooting, he incorrectly identified himself as "Christopher Hardin" and stated it was too dark to see the shooter's face. However, he told officers that the shooter's hairstyle was dreads and he was shorter than 6'1" tall, which matched the description of the defendant, who had dreads and was 5'11" tall.[2] At trial, Mr. Harding identified the defendant as the person who shot Mr. Cutno.

Mr. Broden testified that he attended the party with Mr. Cutno and Mr. Harding, where he observed Mr. Cutno talking to Ms. Porter inside the lobby. Upon walking back into the gymnasium, he observed someone hit Mr. Cutno with a gun, after which he and Mr. Harding punched the attacker. As the attacker prepared to shoot Mr. Cutno, Mr. Broden saw his face and realized it was the defendant.[3] Mr. Broden testified that the defendant then shot Mr. Cutno and fled. Mr. Broden testified that, in his initial interview with officers shortly after the shooting, he told them he barely saw the shooter's face and had never seen the shooter before.[4] However, he stated that two days after the murder, he identified the defendant as the shooter in a photographic lineup. Mr. Broden further testified that the shooter was approximately his height, either 5'10" or 5'11" tall, and subsequently identified

---

[1] Mr. Harding testified that he did not know who the defendant was at the time.

[2] According to Mr. Harding, he did not tell officers the full truth because he wanted revenge and wanted to locate the shooter himself.

[3] Mr. Broden and the defendant attended the same high school for a period of time.

[4] Like Mr. Harding, Mr. Broden testified that he initially withheld the truth from officers, because the two men wanted to locate the shooter themselves.

the defendant, sitting in the courtroom, as the shooter. Finally, Mr. Broden testified that Mr. Cutno and the defendant had issues with each other prior to the shooting.

Ms. Porter testified that when she arrived at the party, she spoke with the defendant, whose nickname is "Sunny," in the lobby. Mr. Cutno approached and asked why she was speaking to the defendant, and the defendant asked why she was speaking to Mr. Cutno. She told them that Mr. Cutno was her cousin and the defendant was her friend. Mr. Cutno then cursed at the defendant and walked back into the gymnasium. Ms. Porter testified that the defendant followed Mr. Cutno, and seconds later, Ms. Porter heard two gunshots.

Dr. Michael Defatta, Chief Pathologist at the St. Tammany Parish Coroner's Office and an expert in the field of forensic pathology, reviewed the autopsy report and photographs in this case. Dr. Defatta testified that Mr. Cutno died from two gunshot wounds to the chest and back.

IPSO Detective Jeremy Balcuns testified that he received a phone call from Tmeria Graves, who informed him that "Sunny" admitted on Instagram that he shot Mr. Cutno. He also received a tip through Crime Stoppers that the defendant's brother, Telly Jackson, was the shooter.[5] Upon further investigation, Detective Balcuns learned that Telly Jackson was 6'3" tall with a darker complexion, and that the defendant, who was 5'11" tall with a medium complexion, more accurately matched the description given by Mr. Harding and Mr. Broden. After Mr. Broden identified the defendant as the shooter, Detective Balcuns prepared an arrest warrant for the defendant.

Detective Balcuns further testified he reviewed the defendant's cell phone records and, shortly after the shooting, the defendant sent a text message to Brendan Washington, stating: "I Just Got Me a Soul."[6] At 12:47 a.m. on April 8, 2018, the defendant sent a text message to his brother, Telly, asking him to tell their mother he did not want to turn himself in because the police did not know who "did it."[7] At 12:48 a.m., the defendant sent a similar text message to his cousin, asking him to advise "T.J." (referring to Telly) to call their mother for the same reason. At 12:40 p.m., the defendant texted Mr. Washington: "Don't Tell Bro

---

[5] At the time of the trial, Telly Jackson was deceased.

[6] The defendant is identified by his nickname, Sunny, in the text message extractions.

[7] Telly is identified as "Marlyana" in the text message extractions. However, Detective Balcuns confirmed the phone number belonged to Telly.

Nothin. [I don't] Wone Spooke Em." On April 10, 2018, the defendant sent a text message to Telly, warning him to stay out of sight.

The defendant testified at trial and stated that he and his brother, Telly, arrived at the party at approximately 11 p.m. on April 7, 2018. Upon entering the building, he spoke to Ms. Porter, after which Mr. Cutno approached and asked why Ms. Porter was speaking to the defendant. Mr. Cutno cursed at him and then returned to the gymnasium. The defendant talked to Ms. Porter for a few more minutes before going into the gymnasium and informing Telly of what Mr. Cutno said, to which Telly replied that the defendant had nothing to worry about. The defendant testified that they separated and, about five to eight minutes later, he heard gunshots. The defendant then ran outside and found Telly, at which point they walked towards Adams Drive, which was one street over from the party.

The defendant further testified he was unarmed the entire night and not in the area of the gymnasium where Mr. Cutno was shot. He denied shooting Mr. Cutno and further denied having any problems with Mr. Cutno prior to the shooting. Regarding his actions following the shooting, the defendant testified he and Telly were together until approximately 1:30 a.m. According to the defendant, Telly used the defendant's phone to send text messages to Mr. Washington, including the text message that stated: "I Just Got Me a Soul."

Pete Edwards, the warden of the Iberville Parish Jail, testified as a rebuttal witness for the State regarding a phone call the defendant made to his grandmother when he returned to jail after court recessed the previous day. The defendant's grandmother told the defendant that Telly was not at the party on the night of the murder, to which the defendant responded that he was, because "I put him on the scene." When his grandmother asked for clarification, the defendant again stated that he placed Telly at the scene.

On appeal, the defendant asserts the evidence presented at trial did not establish beyond a reasonable doubt that he was the perpetrator of the offense. Specifically, the defendant claims that Mr. Harding and Mr. Broden's testimony was not credible and should have been rejected by the jury because they initially lied to police.

After a thorough review of the record, we find that a rational trier of fact, viewing the evidence presented at trial in the light most favorable to the State, could find the

6

evidence proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, all of the elements of second degree murder and the defendant's identity as the perpetrator. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. *State v. Dorsey*, 2010-0216 (La. 9/7/11), 74 So.3d 603, 634, *cert. denied*, 566 U.S. 930, 132 S.Ct. 1859, 182 L.Ed.2d 658 (2012). Further, where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. Accordingly, on appeal, this Court will not assess the credibility of witnesses or reweigh the evidence to overturn a factfinder's determination of guilt. *Southall*, 369 So.3d at 933.

Herein, both Mr. Harding and Mr. Broden testified they were standing near the lobby, which was better lit than the rest of the gymnasium, when they saw the shooter's face, and Mr. Broden immediately recognized the defendant from high school. Further, Mr. Harding and Mr. Broden punched the shooter during the altercation, indicating they were physically close to him. Although Mr. Harding and Mr. Broden initially lied to officers about seeing the shooter's face, they both provided a similar, accurate description of the incident, as well as the shooter's complexion, height, hairstyle, and clothing, within hours of the shooting. When Mr. Broden was brought in to identify the shooter in a photographic lineup two days after the murder, he identified the defendant, who matched the initial description given to officers. Finally, at trial, both Mr. Harding and Mr. Broden positively identified the defendant as the individual who shot Mr. Cutno. Accordingly, the jury could have rationally concluded that Mr. Harding and Mr. Broden, who were in close proximity to the perpetrator in a lit area, had a good view of the individual and properly identified the defendant as the shooter. *See State v. Cockerham*, 2017-0535 (La. App. 1 Cir. 9/21/17), 231 So.3d 698, 704-05, *writ denied*, 2017-1802 (La. 6/15/18), 245 So.3d 1035 (rejecting defendant's theory of misidentification where victim saw the defendant "pretty good" outside in the dark on night of incident and identified defendant shortly after the incident and again at trial).

Moreover, Mr. Broden acknowledged at trial that he originally lied to officers but insisted he was telling the truth before the jury, and was 100% certain the defendant was

7

the shooter. Mr. Harding likewise admitted he was not forthcoming with officers immediately after the shooting but stated he was truthful at trial and had no doubt the defendant killed Mr. Cutno. We note the fact that Mr. Harding and Mr. Broden initially lied to officers does not render their testimony insufficient to support a conviction. Rather, any discrepancy between their prior statements and the in-court testimony goes to the weight of the evidence, not its sufficiency. *See State v. Coleman*, 2017-1045 (La. App. 1 Cir. 4/13/18), 249 So.3d 872, 878-83, *writ denied*, 2018-0830 (La. 2/18/19), 263 So.3d 1155 (concluding sufficient evidence existed for second degree murder conviction, although two eyewitnesses initially denied seeing anything immediately after shooting, but later identified the defendant as the perpetrator).

In addition to witness testimony, the State introduced the defendant's phone records into evidence, which corroborated Mr. Broden and Mr. Harding's identification of the defendant as the shooter. Although the defendant claimed Telly used his phone to send several text messages, including the message stating "I Just Got Me a Soul," he was unable to explain why he was attempting to text Telly during the same time period he testified to being with Telly. Thus, a jury could have rationally concluded the defendant was not with Telly after the shooting as he claimed. Moreover, the jury could have further concluded that, because he was not with Telly, the defendant was the person who sent the message stating "I Just Got Me a Soul," which, according to Detective Balcuns, could mean that he killed someone.

Finally, mere hours after he testified, the defendant called his grandmother, who repeatedly told him that Telly was not at the party that night. However, the defendant insisted that Telly was there because "I put him on the scene." Accordingly, the jury could have reasonably inferred that Telly was never at the party, as the defendant's own grandmother suggested, and that the defendant, in implicating his then-deceased brother in the crime, lied during his testimony.

In finding the defendant guilty of second degree murder, it is clear the jury rejected the defendant's theory of innocence and that Telly was the shooter. The jury heard the conflicting testimony and chose to believe Mr. Harding and Mr. Broden's testimony, rather than the defendant's. The eyewitnesses' detailed accounts, including their identification of

the defendant as the shooter, were corroborated by the defendant's phone records and the phone call to his grandmother. Accordingly, in reviewing the evidence presented at trial, we cannot say the jury's determination that the defendant was guilty of the second degree murder of Mr. Cutno was irrational under the facts and circumstances presented. *See State v. Ordodi*, 2006-0207 (La. 11/29/06), 946 So.2d 654, 662. An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the factfinder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. *See State v. Calloway*, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (*per curiam*). Thus, assignment of error number one lacks merit.

## FAILURE TO REMOVE JUROR

In his second assignment of error, the defendant argues the trial court violated his right to a fair trial by denying his motion to remove a juror who believed he was attacked due to his presence on the jury.

In all criminal prosecutions, a defendant has the right to a fair and impartial jury. U.S. Const. amend. VI; La. Const. art. I, §16; *Duncan v. Louisiana*, 391 U.S. 145, 149, 88 S.Ct. 1444, 1447, 20 L.Ed.2d 491 (1968). It is essential that all facts considered by the jury be presented in the courtroom with the full protection of the defendant's rights to confrontation and due process. *State v. Lebouef*, 2018-0023 (La. App. 1 Cir. 6/1/18), 2018 WL 2453674, *3 (unpublished), *writ denied*, 2018-1070 (La. 11/14/18), 256 So.3d 286, *citing State v. Sinegal*, 393 So.2d 684, 686 (La. 1981). If there is a reasonable possibility that extraneous information considered by the jury affected its verdict, a new trial is mandated. *Lebouef*, 2018 WL 2453674 at *3.

When there is an allegation that a juror must be replaced, the trial court should hold an evidentiary hearing with all parties to determine if the juror needs to be removed. *See State v. Fuller*, 454 So.2d 119, 123 (La. 1984); *also see Remmer v. United States*, 347 U.S. 227, 229-30, 74 S.Ct. 450, 451-52, 98 L.Ed. 654 (1954). After trial has commenced, a sworn juror may be removed only if he is deemed "incompetent to serve" because of death, illness, or any other cause that renders him unfit or disqualified to perform his duty as prescribed. *See* La. C.Cr.P. art. 796; *State v. Cass*, 356 So.2d 396, 397-98 (La. 1977). The trial court

9

has the discretion to remove and replace a juror when the court finds the juror is not impartial. *See* La. C.Cr.P. art. 789(A); *State v. Colbert*, 2007-0947 (La. App. 4 Cir. 7/23/08), 990 So.2d 76, 90, *writ denied*, 2008-2098 (La. 5/15/09), 8 So.3d 579; *see State v. Maillian*, 464 So.2d 1071, 1077-78 (La. App. 1 Cir.), *writ denied*, 469 So.2d 982 (La. 1985). A trial court may also remove and replace a juror when the juror has either the real or potential for bias in the deliberations. *State v. Moran*, 54,281 (La. App. 2 Cir. 5/25/22), 338 So.3d 1229, 1240, *writ denied*, 2022-00935 (La. 10/12/22), 348 So.3d 75, *cert. denied*, ___ U.S. ___, 143 S.Ct. 815, 215 L.Ed.2d 68 (2023).

In this case, on the last day of trial, prior to the State's rebuttal witness and closing arguments, defense counsel moved to strike a juror, Tim Guercio. During an off-the-record, in-chambers meeting with the trial court and all counsel, and outside the presence of the defendant, Mr. Guercio stated that when he was driving home the previous evening, something shattered his car window. Mr. Guercio was scared and shaken up, as he believed someone fired a gun at his vehicle because he was sitting as a juror in the instant case. When police arrived, however, they showed him a surveillance video depicting a truck passing by and assured him his vehicle had not been shot. After watching the video, Mr. Guercio apparently stated he believed his window shattered because of a rock or some other accident. When questioned by the trial court, Mr. Guercio indicated he could "set all of that aside" and still render a fair and impartial verdict. The trial court then instructed Mr. Guercio not to discuss the incident with the other jurors.[8]

Thereafter, the trial court held a sidebar discussion with all counsel, whereupon defense counsel argued Mr. Guercio was unable to set aside his belief that the defendant was capable of intimidating him and thus unable to render a fair and impartial verdict. The trial court denied the defendant's motion to excuse Mr. Guercio, finding no reason to doubt Mr. Guercio's competency to continue to serve as a juror.[9] The trial court noted the incident happened "momentarily" and stated it believed Mr. Guercio "set [the incident] aside." While the jury deliberated, the trial court brought Mr. Guercio into the courtroom for a sidebar

---

[8] The discussion with Mr. Guercio is not contained in the record. After the in-chambers meeting, the trial court summarized Mr. Guercio's statements regarding the incident, as well as his responses to the trial court's questions, on the record.

[9] We note the trial court relied on La. C.Cr.P. art. 787, which governs the disqualification of prospective jurors. Article 787 is inapplicable herein, as Mr. Guercio had already been sworn in by the trial court.

10

discussion with counsel. The trial court asked whether Mr. Guercio discussed the incident with the other jurors, and he said he had not.

On appeal, the defendant asserts Mr. Guercio's belief that the defendant attempted to intimidate or influence him potentially compromised the rest of the jury, and the trial court's subsequent refusal to remove and replace Mr. Guercio violated the defendant's right to a fair and impartial jury. The defendant further argues that the trial court failed to conduct an evidentiary hearing on the record to allow both parties to question Mr. Guercio under oath.

In *State v. Collins*, 02-546 (La. App. 5 Cir. 11/26/02), 833 So.2d 476, 477-78, *writ denied*, 2003-0059 (La. 10/3/03), 855 So.2d 307, the defendant moved for a mistrial after several jurors informed the trial court that they felt threatened and intimidated by menacing gestures made by the defendant's brother. During a closed hearing, most jurors stated they were not intimidated, and each juror indicated they could remain fair and impartial. *Id.* at 479. The trial court then denied the motion and implemented safety measures to protect the jurors. *Id.* at 479. The Fifth Circuit found the defendant was not prejudiced by his brother's actions and found no abuse of discretion in the trial court's denial of the motion. *Id.*

The Second Circuit similarly found no abuse of discretion in the trial court's denial of a defendant's motion for mistrial after two jurors were threatened by the defendant's brother. *State v. Williams*, 45,755 (La. App. 2 Cir. 11/3/10), 54 So.3d 1129, 1140-41, *writs denied*, 2010-2682, 2010-2706 (La. 4/25/11), 62 So.3d 85, 89. When questioned by the trial court, both jurors indicated they neither felt threatened nor targeted as jurors, nor did they believe the incident would affect their ability to serve as a juror. *Id.* at 1140. The trial court then excluded the defendant's brother from the courtroom for the remainder of the trial. *Id.* Noting the trial court conducted a careful inquiry into the incident, the appellate court found no error in the trial court's refusal to remove the jurors. *Id.* at 1140-41.

Herein, we find no abuse of discretion in the trial court's refusal to remove Mr. Guercio as a juror. The trial court questioned Mr. Guercio and determined that he could set aside the incident and remain fair and impartial. Mr. Guercio stated on the record that he did not share the information with anyone. The trial court was able to hear Mr. Guercio's responses,

as well as observe the manner in which his answers were given, the tone of his voice, and his overall demeanor. Furthermore, we note the defendant did not object to the trial court's recitation of what happened to Mr. Guercio or what Mr. Guercio said regarding his ability to remain fair and impartial. In fact, defense counsel acknowledged that Mr. Guercio stated he could be fair. Thus, it appears the defendant acquiesced to the substance of Mr. Guercio's statements but doubted his ability to remain impartial. Ultimately, the trial court was in the best position to assess Mr. Guercio's credibility and believed that Mr. Guercio could remain fair and impartial. *See Williams*, 54 So.3d at 1140-41; *Collins*, 833 So.2d at 478-79.

Moreover, while the defendant contends he was not afforded a hearing on the matter, the record clearly reflects otherwise. After the trial court placed the substance of Mr. Guercio's in-chambers statements on the record, all parties had the opportunity to respond. Furthermore, the defendant did not request an opportunity to question Mr. Guercio under oath on the record. *See Lebouef*, 2018 WL 2453674 at *3. Accordingly, the defendant has failed to show that he was prejudiced by the trial court's refusal to remove Mr. Guercio as a juror.

Therefore, this assignment of error lacks merit.

**CONVICTION AND SENTENCE AFFIRMED.**